*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-FS-434

IN RE S.W., APPELLANT

Appeal from the Superior Court of the
District of Columbia
(DEL-155-12)

(Hon. Milton C. Lee, Jr., Trial Judge)

(Argued September 26, 2014                      Decided September 17, 2015)

*Chris Kemmitt*, Public Defender Service, with whom *James Klein*, *Jaclyn Frankfurt*, and *Monica Douglas*, Public Defender Service, were on the brief, for appellant.

*John W. Donavan*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General at the time the brief was filed, *Todd S. Kim*, Solicitor General, *Rosalyn Calbert Groce*, Deputy Solicitor General, and *Janice Sheppard*, Assistant Attorney General, were on the brief, for the government.

Before BLACKBURNE-RIGSBY and EASTERLY, *Associate Judges*, and EPSTEIN, *Associate Judge* of the Superior Court.[1]

Opinion for the court by *Associate Judge* BLACKBURNE-RIGSBY.

Opinion concurring in part and dissenting in part by *Associate Judge* EASTERLY at page 32.

Opinion concurring in part and dissenting in part by *Associate Judge* EPSTEIN at page 50.

---

[1] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

BLACKBURNE-RIGSBY, *Associate Judge:* This case presents a "rare" instance in which we conclude that "a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* [*v. Arizona*, 384 U.S. 436, 467 (1966).]" *Dickerson v. United States*, 530 U.S. 428, 444 (2000). Specifically, we conclude that a juvenile's confession during custodial interrogation was involuntary, in spite of an effectively delivered *Miranda* warning and a knowing and intelligent waiver of *Miranda* rights, and we reverse the trial court's adjudication of delinquency.[2]

Following a consolidated suppression hearing and bench trial, appellant S.W., a fifteen-year-old juvenile, was adjudicated delinquent on four counts: (1) carjacking, (2) attempted unauthorized use of a motor vehicle, (3) unlawful entry of a motor vehicle, and (4) threats to do bodily harm.[3] On appeal, appellant

---

[2] Appellant argues that reversal is required because the trial court committed constitutional error by admitting his confession and the government cannot show "beyond a reasonable doubt" that the trial court did not rely on this error in reaching its verdict. *See Chapman v. California*, 386 U.S. 18, 24 (1967). The government does not argue otherwise and in fact, the trial court explicitly relied upon appellant's confession in convicting him, stating in its findings that "[m]uch of [Ms. Dougall's] testimony is supported by respondent's statements to the police." Accordingly, we cannot find that the error was harmless, and reversal is required.

[3] *See* D.C. Code § 22-2803 (a)(1) (2012 Repl.); D.C. Code §§ 22-3215, -1803 (2012 Repl.); D.C. Code § 22-1341 (2012 Repl.); and D.C. Code § 22-407 (2012 Repl.), respectively.

challenges the trial court's denial of his motion to suppress statements that he made during post-arrest interrogation. Appellant's principal argument is that the interrogating detective's pre-*Miranda* remarks rendered the subsequent *Miranda* warning ineffective as a matter of law and, consequently, that his confession must be suppressed. Alternatively, appellant argues that the detective's remarks prevented him from making a knowing, intelligent, and voluntary waiver.

We hold that the interrogating detective delivered an effective *Miranda* warning and that appellant made a knowing and intelligent waiver of his *Miranda* rights, but that he did not do so voluntarily. In so holding, we avoid a *per se* rule that either invalidates a *Miranda* warning as a matter of law when law enforcement officials make pre-*Miranda* warning remarks, or that validates a *Miranda* warning as a matter of law when law enforcement officials read the warning verbatim from a waiver card.[4] We reinforce the necessity of looking holistically at every custodial interrogation in reaching a conclusion specific to the facts presented. No "talismanic incantation" is necessary to satisfy *Miranda*. *Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (citation omitted). Nor will "mere recitation of the litany [of rights]" suffice in every circumstance. *Id.* Rather, our inquiry is case-specific,

---

[4] Indeed, we announce no *per se* rule whatsoever with regard to warnings, as our dissenting colleague suggests. See Opinion of Easterly, J., at 43-44. Instead, we specifically decline to do so, favoring a case-specific approach.

asking "whether the warnings reasonably convey to a suspect his [or her] rights as required by *Miranda*." *Id.* (internal quotation marks, citation, and alterations omitted).

## I. Factual Background

### A. *The Incident*

At approximately 10:00 a.m. on January 22, 2012, Tiffany Dougall was pumping gas into her car at a gas station on the corner of Benning Road and East Capitol Street, Northeast, Washington, D.C. She had left the driver-side door ajar with the keys in the ignition. Appellant approached Ms. Dougall's car, sat in the driver seat, and attempted to start the car. As appellant tried to close the car door, Ms. Dougall pulled the door open and retrieved her keys, thwarting appellant's attempt. Appellant exited the car and Ms. Dougall called him a "stupid a-- [expletive]," to which he responded: "I should have shanked you. That's what we do around here." Appellant then ran across the street and entered a metro station. Within approximately twenty minutes, officers of the Metropolitan Police Department ("MPD") arrested appellant and brought him back to the scene where Ms. Dougall identified him.

## B. The Interview

MPD Detective Howard Howland questioned appellant at the MPD Juvenile Processing Center in a video-recorded session that began just before midnight and lasted approximately eighteen minutes.  Appellant's right foot was cuffed to the floor of the interview room, but his hands remained free.  Before issuing a *Miranda* warning, Detective Howland introduced himself and asked appellant if he knew why he was under arrest.[5]  When appellant did not respond, Detective Howland explained:

> I know you know why you're up here, so I ain't gonna play the 'I don't know' crap, all right?  I'm gonna give you an opportunity to give your version of what happened today, because . . . *I stand between you and the lions out there. . . .* [W]e have a lot of things going on out there, and *they're gonna try and say that you did it all.*  Okay?  And I think what happened today was just a one-time thing.  But before I came out here *everybody said . . . you did a whole bunch of stuff*, but in order for us to have a conversation, I have to read you your rights and you have to waive your rights.  If you answer no to any of the questions I ask you after I read you your rights, that's all, I mean, I can't have the interview, okay?

(Emphasis added)

---

[5]  Appellant did not respond to this question.  Thus, any potential error in asking this question before issuing a *Miranda* warning was harmless.  *See Di Giovanni v. United States*, 810 A.2d 887, 894 (D.C. 2002).

Detective Howland read appellant his *Miranda* rights from a waiver card, and appellant, who had not spoken until this point, waived these rights verbally and in writing.[6] Appellant's demeanor and tone remained calm as he subsequently confessed to entering Ms. Dougall's car with the intention of taking it. After the confession, Detective Howland told appellant that he had spoken with appellant's grandmother, who told Detective Howland that she was worried about appellant, that he had just been released from a group home, and that he had been "reported missing." Appellant began to cry at this point and explained that he had left the group home because he had a "beef with a whole lot of people." Detective Howland stated, "[i]t sounds like you got a lotta anger" and "made some bad choices," then told appellant to consider how it feels "for [his] grandmother to see [him] in court" or "locked up," stating that people "who tried to do what [appellant] did . . . get full of bullets." Detective Howland then asked appellant what he would do differently if he could do everything over, and appellant responded "I wouldn't have went to that car."[7]

---

[6] Specifically, appellant answered affirmatively when asked: (1) "Have you read or had read to you the warning as to your rights?" (2) "Do you understand these rights?" (3) "Do you wish to answer any questions?" and (4) "Do you wish to answer any questions without having an attorney present?" Appellant provided his signed waiver card with the record on appeal.

[7] The video recording of appellant's interrogation was included as part of the record on appeal.

### C. *The Motion to Suppress and Trial*

Appellant filed a motion to suppress the statements he made to Detective Howland, alleging, *inter alia*, that he did not knowingly and voluntarily waive his *Miranda* rights, and that the coercive circumstances of the interrogation rendered his statements involuntary. During a hearing on the motion, the trial court viewed the video recording of appellant's interrogation and characterized Detective Howland's pre-*Miranda* remarks as a "very simple set of statements" that did not violate "*Miranda's* prophylactic rule"; in essence, informing appellant that "if you want to talk, this is your opportunity, but you don't have to." The court described these statements as an "age-old tactic" of detectives: sharing pieces of known information to encourage a suspect to be forthcoming with additional information. The court further noted that Detective Howland issued a complete *Miranda* warning and remained an "appreciable distance" from appellant during the conversation and that appellant did not ask follow up questions and appeared to understand the warning.

In assessing the validity of appellant's waiver, the trial court considered factors pertaining to knowledge, intelligence, and voluntariness and concluded, based on the totality of the circumstances, that Detective Howland's remarks did

not invalidate appellant's waiver. The trial court found no indication that appellant was in distress or discomfort and it observed that the combination of Detective Howland's assurance that he could not talk to appellant unless appellant waived his rights and appellant's ready responses to Detective Howland's questions indicated a knowing, intelligent, and voluntary conversation. Furthermore, the court observed that appellant talked freely, chose which questions to answer and which to ignore, seemed lucid and aware of what was happening, and had no mental health issues. Accordingly, the trial court concluded that appellant made the decision to waive his *Miranda* rights "based on his own free will, rational thought, [and] his own intellect," and denied the motion to suppress. Following trial, the court adjudicated appellant delinquent on all four counts. This appeal followed.

## II. Discussion

On appeal from the denial of a motion to suppress on *Miranda* grounds, "we must defer to the trial court's findings of historical fact as long as they are not clearly erroneous, and we must view the facts and the reasonable inferences that may be drawn from them in the light most favorable to sustaining the court's ruling." *Dorsey v. United States*, 60 A.3d 1171, 1190 (D.C. 2013). However, we

review the voluntariness of a *Miranda* waiver, a legal question, *de novo*. *See id.*; *In re M.A.C.*, 761 A.2d 32, 38 (D.C. 2000).

*Miranda* requires that police "adequately and effectively" warn a suspect of his or her right to remain silent and to have an attorney present during custodial interrogation if the suspect's statements are to be admissible at trial. 384 U.S. at 467; *Robinson v. United States*, 928 A.2d 717, 725 (D.C. 2007) (citation omitted). After receiving this warning, a suspect may opt to waive his or her rights. *Miranda, supra*, 384 U.S. at 467, 470 ("No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings . . . have been given."). If a suspect opts to waive *Miranda* rights and later challenges the admissibility of his or her post-waiver statements, the government has the burden to show that the suspect's waiver was "made knowingly, intelligently, and voluntarily." *Di Giovanni, supra* note 5, 810 A.2d at 892; *see Shreeves v. United States*, 395 A.2d 774, 781 (D.C. 1978).

Appellant makes two arguments on appeal, which we address in turn: (A) that Detective Howland's pre-*Miranda* remarks rendered the subsequent *Miranda* warning ineffective as a matter of law and, consequently, that appellant's

confession must be suppressed, and (B) that his waiver of *Miranda* rights was not knowing, intelligent, and voluntary.

### A. *The Validity of the* Miranda *Warning*

Appellant contends that Detective Howland's pre-*Miranda* warning remarks were "embellishments" that conflicted with and confused *Miranda* by generally failing to convey the adversarial nature of the interaction and specifically failing to convey that the consequence of waiver may be conviction, rather than protection from the "lions." Embellishing the warning in this way constitutes trickery, appellant continues, because the remarks falsely conveyed that appellant could not have a conversation without waiving his rights and that he would be penalized if he did not waive them. Accordingly, appellant argues that Detective Howland's pre-*Miranda* remarks rendered the *Miranda* warning that followed ineffective as a matter of law.[8]

---

[8] Appellant's reliance on *United States v. San Juan-Cruz* to support this argument is misplaced. 314 F.3d 384 (9th Cir. 2002). In that case, the Ninth Circuit found that there is a substantial "risk of confusion" when "a warning, not consistent with *Miranda*, is given prior to, after, or simultaneously with a *Miranda* warning" because these multiple warnings impose an unfair burden on a suspect to "sort out" the conflict. *Id.* at 386–89 (concluding that such confusion existed, based on the totality of circumstances, when a suspect received two conflicting *Miranda* warnings on separate occasions from the same Border Patrol agent prior to interrogation, one of which did not fully state the suspect's right to counsel if he

On the facts before us, we conclude that Detective Howland's pre-*Miranda* remarks did not render the subsequent *Miranda* warning ineffective. Appellant's argument relies on *Missouri v. Seibert*, where a plurality of the Supreme Court invalidated a *Miranda* warning after police used a formerly common "question first" tactic, in which police would solicit a full confession, give a technically accurate *Miranda* warning, and then solicit the confession again. 542 U.S. at 604–06. While Detective Howland's pre-*Miranda* remarks cannot be construed as an instance of this "question first" tactic — a *Seibert* situation occurs when a suspect *provides answers* in response to pre-*Miranda* interrogation, a scenario that did not play out here — we have interpreted *Siebert*, and its predecessor *Oregon v. Elstad*, 470 U.S. 298 (1985), as quite applicable to a factual scenario similar to the one before us.[9] In *Hairston v. United States*, a detective entered an interrogation room

---

could not afford it). Even putting aside the different issues presented in *San Juan-Cruz* and the present case — here there was only one verbatim *Miranda* warning — the Ninth Circuit did not announce a *per se* rule that invalidates a *Miranda* warning as matter of law if that warning is accompanied by statements inconsistent with *Miranda*. Rather, it clarified that when a suspect receives *two inconsistent warnings*, "the onus is on the government to clarify to the arrested party the nature of his or her rights under the Fifth Amendment," and it cautioned that the government should not presume that a suspect who has received two contradictory warnings has adequate knowledge of his or her rights. *Id.* at 389.

[9] In *Elstad*, the Supreme Court addressed the effect of a robbery suspect's statement, given in response to police inquiry prior to arrest and *Miranda* warning, that "yes, [he] was there [at the scene of the robbery]." 470 U.S. at 300–01. The Court suppressed this pre-warning statement but concluded that the statement had no effect on the suspect's subsequent warned confession, holding that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby

and, without issuing a *Miranda* warning, introduced himself and informed Mr. Hairston that he faced significant charges and that the detective was interested in hearing Mr. Hairston's side of the story. 905 A.2d 765, 770–71, 782 (D.C. 2006). The detective added, however, that he "just wanted [Mr. Hairston] to listen[,]" and then proceeded to recount facts that showed Mr. Hairston's involvement in the crime and played a silent video of another suspect giving a statement. *Id.* at 770–72. The detective asked Mr. Hairston if he wanted "any help in his case" and if he wanted to "tell his side of the story," to which Mr. Hairston responded affirmatively. *Id.* The detective then issued a *Miranda* warning and Mr. Hairston waived his rights and confessed. *Id.*

In upholding the detective's tactic in *Hairston*, we began by reviewing *Seibert* and *Elstad*, acknowledging that the factual scenario of the "question first" tactic was different than the "just listen" tactic in *Hairston*, but that both cases were nonetheless instructive in determining whether pre-*Miranda* warning interaction "made the *Miranda* warnings administered in the second session of their interaction ineffective," and thereby contaminated a subsequent voluntary

disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318. "Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary." *Id.*

confession. *Id.* at 780–81. In *Elstad*, the Supreme Court framed the inquiry as "whether, in fact, the second [post-*Miranda* warning] statement was also voluntarily made." 470 U.S. at 318. This inquiry requires the fact finder to "examine the surrounding circumstances and the entire course of police conduct" to determine whether the suspect's statements were voluntary. *Id.* "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.* While the unwarned statement must be suppressed, "[n]o further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver." *Id.* Similarly, in *Seibert*, the central inquiry for the plurality was "whether it would be reasonable to find in these circumstances that the warning[] could function 'effectively' as *Miranda* requires." 542 U.S. at 611–12 (citation omitted) (stating that a *Miranda* warning must "effectively advise the suspect that he ha[s] a real choice about giving an admissible statement" and "reasonably convey that he could choose to stop talking").

Accordingly, in *Hairston*, we framed our own inquiry as whether the detective's pre-*Miranda* warning interaction with Mr. Hairston "constitute[d] the functional equivalent of interrogation" such that it had "a coercive impact first on Mr. Hairston's decision to say 'yes,' he wanted to tell his side of the story, and ultimately on his decision to confess." 905 A.2d at 780. On the facts of that case,

we concluded that "the Miranda warnings as administered [to Mr. Hairston] would meaningfully apprise a reasonable suspect of his right or choice to remain silent and thus were effective[.]" *Id*. at 782 (brackets in original, internal quotation marks omitted) (quoting *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1138 (11th Cir. 2006)). We stated, however, that such pre-*Miranda* warning interaction could very well be "the functional equivalent of interrogation" and have "a coercive effect" that overbears a suspect's free will. *Id.* at 780. Yet we concluded that "nothing in the record persuades us . . . that Mr. Hairston's will was overborne[.]" *Id.* at 782 (assessing factors in the record indicating voluntariness, including Mr. Hairston's discretionary responses, his insistence on a typewritten statement, and that he was not under age or particularly vulnerable or impaired).

In the case before us, we do not conclude that Detective Howland's pre-*Miranda* remarks rendered ineffective the *Miranda* warning that followed. Rather, the key inquiry is whether appellant, in spite of Detective Howland's pre-*Miranda* remarks, understood the *Miranda* warning and the consequences of waiver when he decided to waive his rights. *See Hairston, supra*, 905 A.2d at 782 (assessing the effectiveness and adequacy of a *Miranda* warning — in spite of pre-*Miranda* interactions — based on the totality of circumstances, looking to see whether appellant made a knowing, intelligent, and voluntary choice to waive his rights);

*Seibert, supra*, 542 U.S. at 613–14 (asking whether the tactic at issue was "likely to mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them"); *Gonzalez-Lauzan, supra*, 437 F.3d at 1139 (upholding the validity of a *Miranda* warning given between two phases of interrogation, the first in which officers told a suspect to just listen, the second in which officers solicited a confession, because "nothing in the record suggests that [the suspect's] waiver of his rights was uninformed, coerced or involuntary"); *see also Miranda, supra*, 384 U.S. at 469 ("It is only through an awareness of [the] consequences [of waiver] that there can be any assurance of real understanding and intelligent exercise of the privilege."). That is to say, on the facts of the present case, where appellant did not speak before receiving a *Miranda* warning and where he received a complete and accurate *Miranda* warning, our assessment of the impact of pre-*Miranda* remarks takes the perspective of appellant, asking whether, based on the totality of the circumstances, the pre-*Miranda* remarks and the subsequent *Miranda* warning permitted appellant to knowingly, intelligently, and voluntarily waive his *Miranda* rights. *See Di Giovanni, supra* note 5, 810 A.2d at 892. Detective Howland's pre-*Miranda* remarks are "but one factor to be considered in the determination of whether the defendant made a knowing and intelligent waiver of his rights and that the waiver was voluntary." *See United States v. Rawls*, 322 A.2d 903, 907–08

(D.C. 1974) (concluding that a police officer's "unnecessary embellishment on the *Miranda* warning" that "a lawyer would not be provided until the next day" did not, in itself, invalidate the warning). We turn to this inquiry.

### B. The Validity of the Miranda Waiver: Weighing the Totality of the Circumstances

A valid waiver of *Miranda* rights has two distinct components: (1) it must be knowing and intelligent, "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and (2) it must be voluntary, "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *In re M.A.*, 33 A.3d 378, 381 (D.C. 2011) (citing *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010)). In assessing whether a *Miranda* waiver was knowing, intelligent, and voluntary, we consider "the particular facts and circumstances surrounding [the] case" and base our determination on the totality of the circumstances. *Di Giovanni, supra* note 5, 810 A.2d at 892 (internal quotations and citations omitted).

The "admissions and confessions of juveniles require special caution." *In re M.A.C., supra*, 761 A.2d at 36 (citing *In re Gault*, 387 U.S. 1, 45 (1967)). Applying the totality of the circumstances inquiry to the juvenile context, we

consider "the juvenile's age, experience, education, background and intelligence, the circumstances under which the statement was given, and whether the juvenile has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.* (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). In addition, we may consider the juvenile suspect's prior experience with the legal system. *Di Giovanni, supra* note 5, 810 A.2d at 892.

Turning to this two-part inquiry, we conclude that appellant knowingly and intelligently waived his *Miranda* rights, but that he did not do so voluntarily.[10]

### 1. Knowing and Intelligent Waiver

Appellant argues that he could not have knowingly and intelligently waived his rights after receiving a "confounding and inaccurately conveyed" *Miranda* warning from Detective Howland. Detective Howland's statements, appellant argues, incorrectly characterized the consequences of signing the waiver by giving

---

[10] The trial court conducted a combined totality of the circumstances analysis, simultaneously assessing factors relevant to knowledge, intelligence, and voluntariness to reach an overall conclusion. We have taken this approach in many of our cases, *see, e.g.*, *In re M.A.C., supra*, 761 A.2d at 38–9, while in others we have opted to separate this analysis, *see, e.g.*, *Dorsey, supra*, 60 A.3d at 1200–06, as we do in the present case.

appellant the option to "[s]tay silent and be thrown to the lions, or speak and be protected by Detective How[land]."[11] Thus, the "most plausible thesis," appellant argues, is that he merely "follow[ed] the direction of an authority figure — something juveniles are highly inclined to do" — rather than knowingly and intelligently waiving his rights.

A suspect's waiver is knowing and intelligent when, considering the totality of the circumstances, the suspect demonstrates "awareness of the right to remain silent and [makes] a decision to forego that right." *Robinson, supra*, 928 A.2d at 725 (quoting *United States v. Yunis*, 273 U.S. App. D.C. 290, 301, 859 F.2d 953, 964 (1988)). As a result, "the government bears a heavy burden to show: (1) that the defendant understood [the right] . . . ; and (2) that the defendant intentionally relinquished or abandoned that 'known right[.]'" *Shreeves, supra*, 395 A.2d at 781 (citations and internal quotation marks omitted); *see Fare, supra*, 442 U.S. at 726 (concluding, based on the totality of the circumstances, that a juvenile suspect had knowingly and intelligently waived his rights after police officers explained that he was being questioned regarding a crime and "informed him of all the rights delineated in *Miranda*, and ascertained that [the suspect] understood those

---

[11] In particular, appellant points to Detective Howland's statement: "I know you know why you're up here, so I ain't gonna play the 'I don't know' crap," and Detective Howland's invitation to "give your version of what happened today," followed by the statement "I stand between you and the lions out there."

rights[,]" and where the suspect provided "no indication" that he "failed to understand what the officers told him[,]" and "clearly expressed his willingness to waive his rights and continue the interrogation").

Because our analysis takes appellant's perspective with regard to whether the totality of circumstances indicates that he made a knowing and intelligent waiver, we begin by considering the information before him when he waived his rights. Detective Howland's pre-*Miranda* remarks — namely, his references to protecting appellant from the "lions out there" who want to pin a "whole bunch of stuff" on appellant — are one factor in our analysis. *See Rawls, supra*, 322 A.2d at 907–08. Following these remarks, the video recording of appellant's interrogation establishes that Detective Howland told appellant that:

> [I]n order for us to have a conversation, I have to read you your rights and you have to waive your rights. If you answer no to any of the questions I ask you after I read you your rights, that's all, I mean, I can't have the interview, okay?

Appellant remained silent and Detective Howland read aloud a complete and unmodified *Miranda* warning from the waiver card. Appellant affirmed his understanding of each right vocally and in writing.

The trial court made specific findings under a "totality of the circumstances" analysis after reviewing the video recording of appellant's confession. The trial court found that Detective Howland's pre-*Miranda* remarks were "just kind of so general[,]" in essence, a "very simple set of statements" that "went through *Miranda* in detail," providing context for the boilerplate *Miranda* warning that he subsequently read from a waiver card. After Detective Howland read aloud from the *Miranda* waiver card, the trial court observed that he "asked about [appellant's] rights in each of the four sections." Appellant "appeared to understand[,]" the trial court found, and "didn't ask any follow-up questions[,]" and affirmatively answered each of Detective Howland's four confirmatory questions before signing the waiver card. The trial court also noted the absence of "any mental health concerns," stating that appellant "seemed lucid" and "aware of what was going on." Appellant "seemed to know particularly what he was doing, [and] seemed to want to talk about it[,]" and "certainly picks and chooses th[r]ough what he wants to answer." As Detective Howland asked questions, appellant "didn't really seem to have any difficulty . . . indicating to the detective by not answering [that ']I am not talking about that subject matter.[']"

On these findings, trial court concluded, and we agree, that appellant waived his rights using his own "rational thought" and "intellect." While we do not

condone "a police officer's deliberate decision to withhold *Miranda* warnings prior to speaking with a person who is under arrest[,]" *see Hairston, supra*, 905 A.2d at 782, we defer to the trial court's findings and uphold its conclusion that Detective Howland's pre-*Miranda* remarks did not mischaracterize the verbatim *Miranda* warning that followed. *Contra, e.g.*, *Di Giovanni, supra* note 5, 810 A.2d at 894 (concluding that a police officer had invalidated a suspect's waiver by explaining that the police officer did not think the suspect needed a lawyer and that it would be best to explain his side of the story); *Lee v. State*, 12 A.3d 1238, 1250–51 (Md. 2011) (concluding that the detective's statement "this is between you and me, bud" violated *Miranda* by "undermining the warning" that the defendant's statements could be used against him). We conclude that Detective Howland accurately and comprehensively apprised appellant of his rights, *see Fare, supra*, 442 U.S. at 726, and that Detective Howland's pre-*Miranda* remarks, while relevant to our continued inquiry, did not prevent appellant from making a knowing and intelligent waiver, *see Rawls, supra*, 322 A.2d at 907–08. Left for us now is the question of whether appellant's waiver was voluntary.

## 2. *Voluntary Waiver*

Appellant contends that Detective Howland coerced him into waiving his rights by indicating that appellant would only be protected from "the lions and the additional charges they wished to bring" if appellant waived his rights, and by suggesting that appellant would face a penalty — the additional charges — if he did not waive his rights. Appellant analogizes Detective Howland's interrogation tactic to one employed in the Ninth Circuit case *Collazo v. Estelle*, where an interrogating police officer told a suspect who had invoked his *Miranda* rights by asking to speak with a lawyer that it "might be worse" if he did so and that it would be in his interest to proceed without one. 940 F.2d 411, 414 (9th Cir. 1991). The Ninth Circuit held that these statements created a penalty for exercising constitutional rights and concluded that the officer had failed to "scrupulously honor Collazo's right to cut off questioning" and nullified *Miranda's* express purpose to alleviate the "compelling pressures" of interrogation. *Id.* at 416–18 (citing *Miranda, supra*, 384 U.S. at 479) (internal quotation marks omitted).

*Miranda's* "critical safeguard" against the coercive pressures of custody is a suspect's understanding of the right to end questioning and that law enforcement must respect this right. *See Dorsey, supra*, 60 A.3d at 1191 (citing *Michigan v.*

*Mosley*, 423 U.S. 96, 104 (1975)); *see also Berghuis, supra*, 560 U.S. at 386 (stating that the suspect must be aware "that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation"). Without this safeguard, "the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." *Dorsey, supra*, 60 A.3d at 1191. "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda, supra*, 384 U.S. at 476. "The test for determining the voluntariness of specific statements is whether, under the totality of the circumstances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion." *Dorsey, supra*, 60 A.3d at 1203.

Bearing these principles in mind, we are keenly aware of the "special caution" required in our *de novo* review of the voluntariness of appellant's confession, given his juvenile status, and we take great care to assess the impact of subtle interrogation tactics. *In re M.A.C., supra*, 761 A.2d at 36 (citing *In re Gault*, 387 U.S. at 45); *Dorsey, supra*, 60 A.3d at 1190. Our inquiry rests on many of the same factors mentioned in our "knowing and intelligent" inquiry above: we must determine whether, on the totality of the circumstances, appellant's will was

overborne by Detective Howland's remarks and the circumstances of the interrogation. *See Castellon v. United States*, 864 A.2d 141, 157 (D.C. 2004). Specific to the voluntariness component, we also consider a juvenile suspect's physical and mental condition, the duration and intensity of the interrogation, the hour at which it occurred, and any evidence of physical abuse, threats, punishment, or trickery. *See In re J.F.*, 987 A.2d 1168, 1177 (D.C. 2010) (citations omitted). A "totality of the circumstances" analysis is a subjective analysis, and we have accordingly upheld the validity of *Miranda* waivers on voluntariness grounds in the juvenile context where the totality of the circumstances weighed in favor of such a conclusion,[12] and invalidated *Miranda* waivers on the same grounds where the totality of the circumstances weighed against such a conclusion.[13]

---

[12] *See In re M.A., supra*, 33 A.3d at 379, 382 (concluding that a fifteen-year-old who "spoke little English" and "had no previous experience with the American legal system" had waived his rights and confessed voluntarily, in spite of a detective's admonition that "if you value your mother, value your little sister, the best thing you can do is tell the truth," because this statement referred to the boy's personal interest in helping his family, not his legal interests, and because the boy "had a calm demeanor, did not manifest any reading difficulties, and did not ask for further clarification"); *In re D.W.*, 989 A.2d 196, 203–04 (D.C. 2010) (concluding that a juvenile had voluntarily waived his *Miranda* rights after a detective issued a warning "as soon as the officer came to be seated in the room with the [suspect]," deferring to the trial court's findings based on a video recording of the confession showing the suspect's "demeanor, energy level, and apparent level of understanding" and that he was unrestrained); *Matter of D.A.S.*, 391 A.2d 255, 258–59 (D.C. 1978) (concluding that a confession was voluntary when police led a seventeen-year-old suspect "to believe that the evidence against him is stronger than it is" because he had prior experience with law enforcement,

Reviewing the factors relating to voluntariness in the record before us, we return to the trial court's findings, to which we accord deference. *See Dorsey, supra*, 60 A.3d at 1190. After viewing appellant's approximately eighteen-minute video-recorded interrogation, the trial court observed that appellant was cuffed to the floor[14] but appeared "relaxed" and not "under any particular distress" or "discomfort" and stated that "[t]here's no evidence of physical injuries[.]" The trial court found that Detective Howland "maintained an appreciable distance" from appellant and was "kind of sitting back . . . not really up on top of [appellant]." The trial court also noted that "[t]here don't seem to be any mental health concerns[.]" As to Detective Howland's pre-*Miranda* remarks, the trial court found that they were not "an eye-opener" for appellant; while "[o]ne might conclude[] that [the pre-*Miranda* remarks] relate[] to more serious charges[,]" appellant "had to know that . . . he was facing a pretty significant set of charges[.]"

was not restrained, threatened, or coerced, was repeatedly informed of his rights, and understood those rights).

[13] *See In re. J.F., supra*, 987 A.2d at 1177 (concluding that a fourteen-year-old's confession was involuntary because police officers, over the course of a two-hour interrogation, told him that he could not leave until he confessed, even though he had denied culpability sixty-three times, and much of his confession simply repeated the officer's suggested version of events); *In re T.T.T.*, 365 A.2d 366, 369 (D.C. 1976) (concluding that a fifteen-year-old's confession was involuntary, in spite of multiple valid waivers during an interview lasting approximately ten hours, after detectives pressed him to elaborate upon a prior confession after he had invoked his *Miranda* rights).

[14] The trial court stated that appellant was "hand cuffed" but the video recording shows that appellant wore an ankle cuff.

Detective Howland was using an "age-old tactic of detectives[,]" the trial court concluded, in which "they have particular information and they share pieces of it" and "sometimes not even completely . . . telling the truth" about the information that they know. Accordingly, the trial court concluded that this "use of trickery" did not violate *Miranda* and that appellant made a decision to waive his rights "based on his own free will[.]"

The question we address on review is one of tactics; namely, whether Detective Howland's interrogation tactic of making pre-*Miranda* warning statements that conveyed the gravity of appellant's situation combined with the surrounding circumstances of the interrogation to render appellant's waiver involuntary. As explained in Section II-A, Detective Howland's tactic bears some resemblance to the "just listen" tactic that we upheld in *Hairston*. While that tactic was quite possibly coercive from an objective standpoint, in the circumstances of *Hairston* we held that it did not "constitute the functional equivalent of interrogation[,]" such that its "coercive impact" rendered Mr. Hairston's post-waiver confession involuntary. 905 A.2d at 780–82. Here, as in *Hairston*, Detective Howland spoke generally about the case against appellant while appellant listened and remained silent until Detective Howland issued a *Miranda* warning and asked appellant whether he wanted to waive his rights. *Id.* at 771.

Also, as in *Hairston*, Detective Howland's remarks were, no doubt, an attempt to bolster the case against appellant to encourage him to share his side of the story. *Id.* at 771–72.

Yet Detective Howland's tactic is dissimilar to *Hairston* in one dispositive aspect: rather than recounting the specific evidence implicating appellant, Detective Howland referred generally to unspecified charges that appellant would face if the "lions out there" had their way. We have previously upheld the interrogation tactic of deceiving a suspect into believing "that the evidence against him is stronger than it is." *Matter of D.A.S., supra* note 12, 391 A.2d at 258. Yet such deception crosses the line to inadmissible coercion when other circumstances combine with it to "mak[e] the situation appear hopeless[.]" *Id.* at 259. (citations omitted). Such circumstances manifested here when Detective Howland portrayed himself as appellant's protector from these "lions," ostensibly referencing other people in the processing center, and stated that "everybody" — presumably the "lions" — "said . . . you did a whole bunch of stuff" and "they're gonna try and say that you did it all" unless appellant accepted the opportunity "to give [his] version of what happened." In essence, by portraying himself as protector from the "lions out there," Detective Howland supplied the reverse implication: that if appellant does not waive his rights, Detective Howland will throw him to the "lions." Taken

together, these statements seem to suggest that if appellant remained silent, he would face fabricated charges for things that he did not do.

Detective Howland did not explicitly tell appellant that "it might be worse" for him if he invoked his rights, as in *Collazo*, but he strongly implied it. 940 F.2d at 414. The facts of *Collazo* are not directly applicable to the factual scenario before us — there, the officer's statement that "it might be worse" was in response to Collazo's invocation of his right to counsel — but the legal principal of *Collazo* is readily applicable. The Ninth Circuit observed that the officer's statements "were calculated to pressure Collazo into changing his mind about remaining silent, and into talking without counsel to his interrogators" and concluded that the officer's subsequent statement "that it 'might be worse' for Collazo if he did not cooperate with the police can only be seen as menacing." *Id.* at 416. This statement, the court explained, was an attempt to "impose a penalty" for invoking *Miranda* rights, *id.* at 417, and we see little difference in the nature of this post-*Miranda* statement and Detective Howland's pre-*Miranda* statements. Telling a suspect that invoking his constitutional rights will result in adverse consequences is an "unquestionably coercive" tactic. *Dorsey, supra*, 60 A.3d at 1202–04 (holding that detectives violated *Miranda* by "exhorting [a suspect] that [asserting his rights] would work to his disadvantage while their relinquishment would benefit

him"); *see also United States v. Harrison*, 34 F.3d 886, 891–92 (9th Cir. 1994) ("[T]here are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor.").[15] Here, Detective Howland's remarks come much closer to the "unquestionably coercive" tactics in *Dorsey, supra*, 60 A.3d at 1203–04, than to the acceptable deception regarding the strength of the evidence in *Matter of D.A.S., supra* note 12, 391 A.2d at 258.[16]

We emphasize the role of appellant's juvenile status. In any custodial interrogation situation, "the seemingly benign transmittal of information to an accused may resemble the kind of mental games that largely generated the *Miranda* decision itself." *See United States v. Brown*, 737 A.2d 1016, 1021 (D.C. 1999). This warning is all the more applicable in the juvenile context, where courts must exercise "special caution" in conducting a voluntariness analysis. *See*

---

[15] Of course, not all forms of pressure to waive *Miranda* rights to avoid adverse consequences are coercive and in violation of *Miranda*. See *supra* note 12; *see also Hairston, supra*, 905 A.2d at 770–72.

[16] Yet another factor appears to weigh in favor of involuntary waiver: although Detective Howland's interview lasted only eighteen minutes, there is some confusion as to how long appellant had been in custody at the time. Appellant's brief indicates that he was interviewed at "11:54 a.m.[,]" or nearly two hours after the crime, whereas the video recording of the interview indicates that Detective Howland stated "it's about 11:54 p.m." as he filled out the waiver card, placing the interview nearly fourteen hours after the crime. The waiver card provided with the record on appeal is inconclusive.

*In re M.A.C., supra*, 761 A.2d at 36 (citing *In re Gault*, 387 U.S. at 45). Even in the absence of circumstances indicating physical coercion or visible distress, we conclude that a reasonable juvenile suspect in appellant's situation would understand Detective Howland's pre-*Miranda* statements — specifically "I stand between you and the lions out there. . . and they're gonna try and say that you did it all" and "everybody said . . . you did a whole bunch of stuff" — as a veiled threat to throw appellant to the "lions" who would charge appellant with other crimes unrelated to the present incident that may not even involve appellant. This statement is incompatible with the presumption of innocence. *See Miller v. Fenton*, 474 U.S. 104, 116 (1985) ("[T]he admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.").[17]

---

[17] Our colleague dissenting as to our voluntariness conclusion suggests that whether a suspect's will was overborne is a "fact-bound" aspect of the ultimate legal question of voluntariness, and that we are required to "defer[] to [the trial court's] voluntariness finding" so long as the record supports it. See Opinion of Epstein, J., at 53. In support, our colleague cites to a patent construction case in which the Supreme Court relied by analogy on *Miranda* principles for the proposition that "[t]he answer to the legal question about the voluntariness of the confession may turn upon the answer to a subsidiary factual question[.]" *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841–42 (2015) (citing *Miller, supra*, 474 U.S. at 112–118).

## III. Conclusion

Considering the totality of the circumstances, with particular emphasis on Detective Howland's references to unspecified charges that a juvenile appellant would face and his offer to stand between appellant and the "lions out there," we cannot conclude that Detective Howland's pre-*Miranda* remarks left appellant with a "real choice about giving an admissible statement." *See Hairston, supra*, 905 A.2d at 780–82 (quoting *Seibert, supra*, 542 U.S. at 612). From appellant's perspective, Detective Howland's statements "ma[de] the situation appear hopeless" and thereby constituted coercion. *See Matter of D.A.S., supra* note 12,

---

We do not read *Teva Pharmaceuticals* to require the deference that our colleague suggests. This characterization blurs the distinction between factual findings and legal conclusions and would often permit the legal question of voluntariness to evade review by this court altogether. Indeed, in the same paragraph that our colleague cites, the Supreme Court stated that, in spite of the deference required, "the ultimate question of construction [here, the equivalent question is voluntariness] will remain a legal question." *Id.* at 842. The Supreme Court added that "[a]n appellate court will review the trial judge's factual determination about the alleged intimidation deferentially (though, after reviewing the factual findings, it will review a judge's ultimate determination of voluntariness *de novo*)." *Id.* (citing *Miller, supra*, 474 U.S. at 112–118). Similarly, our recent opinion in *Turner v. United States* explained that we defer to the factual findings supported by the record, "but we do not accord comparable deference to . . . the judge's determination on the ultimate question of *Brady* materiality [here, the equivalent question is voluntariness]. With due appreciation for the fact-bound nature of this ultimate question, we must review it *de novo* on appeal." 116 A.3d 894, 915 (D.C. 2015). Thus, whether Detective Howland's statements expressly or impliedly coerced appellant to waive his *Miranda* rights is a question that we review *de novo*.

391 A.2d at 259; *see also In re M.A.C., supra*, 761 A.2d at 36 (citing *In re Gault, supra*, 387 U.S. at 45) (stating that the "admissions and confessions of juveniles require special caution"). Accordingly, while we conclude that appellant received an effective *Miranda* warning and that Detective Howland's pre-*Miranda* remarks did not render the warning ineffective *per se*, we also conclude that appellant did not voluntarily waive his *Miranda* rights. We reverse the trial court's adjudication of delinquency.

*So ordered.*

EASTERLY, *Associate Judge*, *concurring in part and dissenting in part*: I concur with the conclusion of Part II.B.2 that S.W. did not voluntarily waive his *Miranda* rights. In my view, however, it is unnecessary and ill-advised for us to reach the issue of the voluntariness of S.W.'s waiver.

Our analysis should begin and end with an examination of the warnings the detective gave to S.W. before S.W. waived his rights. To be sure, the detective read from a preprinted card that addressed the topics mandated by *Miranda*.[1] But that was not all the detective said about S.W.'s rights to remain silent and to

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

counsel, or about the detective's own role in any interrogation that might follow. Immediately prior to reading S.W. the rights card, the detective incorrectly communicated to S.W. that he was not S.W.'s adversary; that he, unlike "the lions," i.e., his colleagues outside the room, was seeking to help S.W.; that the lions were going to try to falsely accuse S.W. of things S.W. had not done; that the only way he could help S.W. and keep the lions at bay was if S.W. talked; and that he and S.W. could not talk unless S.W. waived his rights. Having delivered this preamble, the detective then read aloud from the preprinted card and, unsurprisingly, S.W. waived his rights—unsurprisingly, because the warnings *as a whole* did not "reasonably convey to [S.W.] his rights as required by *Miranda*" and did not under "these circumstances . . . function effectively." *See Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)).

"Just as no talismanic incantation is required to satisfy *Miranda*'s strictures, it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance." *Id.* (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981)). In other words, we cannot be satisfied that adequate and effective warnings have been given every time the police read from a

preprinted rights card, no matter what else the police say. *See id.* That would miss the point of *Miranda* entirely.

In *Miranda*, the Supreme Court recognized "that the modern practice of in-custody interrogation is psychologically rather than physically oriented." 384 U.S. at 448. The Court described a number of interrogation techniques, among them "the Mutt and Jeff act," a classic bad cop-good cop routine.[2] *Id*. at 452. It explained that the police, "by trading on [an interviewee's] insecurity about himself or his surroundings[,] . . . . persuade, trick or cajole him out of exercising his constitutional rights." *Id*. at 455. The Court concluded that the "traditional" totality-of-the-circumstances test for identifying involuntary confessions (more easily employed when an individual was physically coerced) was not up to the task of assessing the effect of these various psychological pressures on an individual suspect and thus provided inadequate protection against compelled self-incrimination. *See id*. at 457, 467; *see also Seibert*, 542 U.S. at 608; *Dickerson v.*

---

[2] As the Court explained it:

> In this technique, two agents are employed. Mutt, the relentless investigator, who knows the subject is guilty and is not going to waste any time. . . . Jeff, on the other hand, is obviously a kindhearted man. . . . He disapproves of Mutt and his tactics and will arrange to get him off the case if the subject will cooperate. He can't hold Mutt off for very long. The subject would be wise to make a quick decision.

*Id*. at 452.

*United States*, 530 U.S. 428, 442 (2000). The Court was concerned that "[r]ights declared in words," namely, the right against compelled self-incrimination and the right to the assistance of counsel, "might be lost in reality." 384 U.S. at 443 (quoting *Weems v. United States*, 217 U.S. 349, 373 (1910)). It determined that procedural safeguards were needed: warnings that could serve as a "clearcut fact" that the interviewee had been advised and thus was aware of the constitutional protections available to him in the adversarial setting of an interrogation.[3] *Id*. at 468-69.

---

[3] My colleague dissenting from the court's determination that S.W.'s waiver was involuntarily made seems to lose sight of the *Miranda* warnings' essence as a procedural protection; he seems to think our interest is only in ensuring the veracity of any confession obtained. False confessions are a real and serious concern; but the rationale for *Miranda* warnings extends well beyond forestalling false confessions. *Miranda* warnings are grounded in the right against compelled self-incrimination. *Miranda*, 384 U.S. at 457-58, 465-66. As the Court in *Miranda* explained:

> [T]he constitutional foundation . . . is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.

*Id*. at 460 (internal citations omitted). *Miranda* warnings are also grounded in the recognition that the right to counsel "is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today." *Id*. at 469; *see Gideon v. Wainwright*, 372 U.S. 335, 343 (1963) (explaining that an individual's right to the assistance of counsel when subject to a prosecution by the government "is one of the safeguards of the Sixth Amendment deemed necessary to insure

With respect to these warnings, the Court made one thing pellucidly clear: function was all. The Court eschewed "impotent and lifeless formulas." 384 U.S. at 443 (quoting *Weems*, 217 U.S. at 373). It never endorsed a script. Two core constitutional rights had to be addressed—the right to remain silent and the right to counsel (court-appointed if the individual could not afford to hire an attorney)—and the individual had to be told that his words could be used against him in court so that he would be "acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Id.* at 469. But the Court was willing to leave the particular procedures and precise phrasing to individual jurisdictions *so long as* these procedures and warnings "adequately and effectively" protected individuals' rights against coerced self-incrimination. *Id.* at 467.[4]

---

fundamental human rights of life and liberty" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938))).

[4] *See id.* at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."); *id.* at 478-79 (detailing the warnings that are required "unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored"); *id.* at 490 ("Congress and the States are free to develop their own safeguards for the privilege, so long as they are fully as effective as those described above . . . .").

"There [were] those, of course, who preferred the old way of doing things," i.e., "giving no warnings." *Seibert*, 542 U.S. at 609. And attacks were mounted against *Miranda* warnings—both direct, *see, e.g.*, *Dickerson v. United States*, 530 U.S. 428 (2000), and indirect. "The technique of interrogating in successive unwarned and warned phases," at issue in *Seibert*, was but one "police strategy adapted to undermine the *Miranda* warnings."[5] *Seibert*, 542 U.S. at 609, 616. The Court condemned that effort to deprive a defendant of "a real choice between talking and remaining silent." *Id.* at 609. And it emphatically stated that the "mere recitation of the litany" would not always suffice; that the context in which these recitations were made could disable these warnings; and that "it would be absurd to think" otherwise. *Id.* at 611. The Court concluded by warning the "[s]trategists dedicated to draining the substance out of *Miranda*" that they could not accomplish indirectly "what *Dickerson* held Congress could not do by statute," i.e., remove *Miranda* warnings as a first-line defense against compelled custodial interrogations.[6] *Id.* at 617.

---

[5] *See Seibert*, 542 U.S. at 610 n.2 (detailing other methods).

[6] Although *Seibert* was plurality opinion, Justice Kennedy provided a fifth vote for the determination that law enforcement officers do not comply with *Miranda* if they advise a defendant of all the rights on the *Miranda* checklist but communicate those warnings in a way that subverts their purpose. 542 U.S. at 621 (Kennedy, J., concurring) ("The *Miranda* rule would be frustrated were we to allow police to undermine its meaning and effect.").

Despite this admonition, these "strategists" did not give up after *Seibert*. They simply changed tactics, for example, by spiking the recitation of rights with a preamble that tells the interviewee in so many words: you really do not have a choice; waiver is your only option.[7] The Queens District Attorney's Office in New York tried this in 2007, when it instituted a practice of delivering scripted warnings that commenced with detectives (with a prosecutor at their side) telling interviewees, among other things, "this is your opportunity to tell us your story," and "[t]his will be your only opportunity to speak with us before you go to court on these charges." *People v. Dunbar*, 24 N.Y.3d 304, 308-09 (2014), *cert. denied*, 135 S. Ct. 2051 (2015), *cert. denied*, 135 S. Ct. 2052 (2015). The New York courts—first the intermediate courts of appeal, then the highest court in the state—decisively shut this practice down. The New York Court of Appeals explained that this "preamble, which is at best confusing and at worst misleading, rendered the subsequent *Miranda* warnings inadequate and ineffective." *Id*. at 316. The court further explained:

---

[7] *See, e.g.*, Yale Kamisar, Commentary, *A Look Back at the "Gatehouses and Mansions" of American Criminal Procedure*, 12 OHIO ST. J. CRIM. L. 645, 654 & n.41 (2015) ("There is reason to believe that the delivery of the Miranda warnings is sometimes, perhaps even routinely, undermined by police interrogators who . . . inform suspects at the outset that they will not be able to tell the police 'their side of the story' unless they first waive their rights."); Charles D. Weisselberg, *Mourning Miranda*, 96 CALIF. L. REV. 1519, 1557-61 (2008) (reviewing the use of "softening up" tactics designed to de-emphasize the significance of the *Miranda* warnings and increase the likelihood of waiver).

> Before they were read their *Miranda* rights, [the defendants] were warned, for all intents and purposes, that remaining silent or invoking the right to counsel would come at a price—they would be giving up a valuable opportunity to speak with an assistant district attorney, to have their cases investigated or to assert alibi defenses. The statements to "give me as much information as you can," that "this is your opportunity to tell us your story" and that you "have to tell us now" directly contradicted the later warning that they had the right to remain silent. By advising them that speaking would facilitate an investigation, the interrogators implied that these defendants' words would be used to help them, thus undoing the heart of the warning that anything they said could and would be used against them. And the statement that the prearraignment interrogation was their "only opportunity" to speak falsely suggested that requesting counsel would cause them to lose the chance to talk to an assistant district attorney.

*Id.*

As a consequence, the Court of Appeals determined that the issue was not whether "these defendants' waivers were valid, but rather whether or not they were ever 'clearly informed' of their *Miranda* rights in the first place." *Id.* The court determined that they were not. As the court explained, no one would defend "*Miranda* warnings [that] were preceded by statements that were *directly* contrary to those warnings (*e.g.*, you are required to answer our questions; your statements will be used to help you; you are not entitled to a lawyer)." *Id.* "The preamble did the same thing, albeit in an indirect, more subtle way. . . . [A] reasonable person in

these defendants' shoes might well have concluded, after having listened to the preamble, that it was in his best interest to get out his side of the story—fast." *Id.*[8]

The warnings delivered in this case were not, at least as far as we know, part of some MPD-wide protocol, but they were of the same ilk as those employed in *Dunbar*, consisting of a neutralizing preamble followed by a recitation of rights. The detective gave his warnings to S.W. as follows:

> *I'm gonna give you an opportunity* to give your version of what happened today, cause . . . *I stand between you and the lions out there.* Cause they're gonna think—right now we have a lotta things goin' on out there, and they're gonna try and say that you did it all. Okay? And I think what happened today was just a one-time thing. But before I came out here everybody said, you know, tryin' to say you did a whole buncha stuff *but . . . in order for us to have a conversation, I have to read you your rights and you have to waive your rights. If you answer no* to any of the questions I ask you after I read you your rights, *that's all*—I mean, I can't have the interview, okay? It's uh, what's today's date? Today's the 22nd, it's about 11:54 p.m. You are under arrest. Before we ask you any questions, you

---

[8] Other courts have similarly rejected *Miranda* warnings that obscure the meaning of the rights the warnings are meant to protect. *See, e.g.*, *Hart v. Att'y Gen. of State of Fla.*, 323 F.3d 884, 894 (11th Cir. 2003) (clarity of *Miranda* warnings compromised where police told defendant both that incriminating statements could be used against him and, inconsistently, that "honesty will not hurt you"); *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2002) ("'What *Miranda* requires is meaningful advice to the unlettered and unlearned in language which they can comprehend and on which they can knowingly act.' In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading. The warning must be clear and not susceptible to equivocation." (quoting *United States v. Connell*, 869 F.2d 1349, 1351 (9th Cir. 1989))).

> must understand what your rights are. . . . [Rights card is read]. Do you understand these rights?

S.W. responded yes, and then waived.

These warnings were just as confusing and misleading as those employed in *Dunbar*. The message that this was "an opportunity" for S.W. to better his position, and the encouragement to take it quickly, "implied that [S.W.'s] words would be used to help [him], thus undoing the heart of the warning that anything [he] said could and would be used against [him]." 24 N.Y.3d at 316.[9] The exhortations to "waive" and talk now also "directly contradicted the later warning that [S.W.] had the right to remain silent," *id.*, not to mention a right to consult with counsel. The statement that if he did not waive, "that's all," also communicated that S.W.'s exercise of his rights "would come at a price" of giving up an irretrievable "opportunity" to speak to law enforcement. *Id.*

In addition, these warnings also included a coercive element that the warnings in *Dunbar* did not: the detective told S.W. that the lions were waiting for him outside the room, that only the detective could hold them at bay, and that the

---

[9] *Cf. Lee v. State*, 12 A.3d 1238, 1245-46 (Md. 2011) (holding that police officer's statement to defendant mid-interrogation, "[t]his is between you and me, bud. Only me and you are here, all right?" negated prior waiver of *Miranda* rights).

lions were, in the words of my colleague, ready to "fabricate[] charges" against S.W.[10] These statements vitiated the recitation of rights that followed. The implication that S.W.'s constitutional rights to silence and to counsel would afford him no protection—that only the detective could help S.W.—turns *Miranda* on its head.

The detective in this case applied the exact sort of psychological pressure that motivated the Supreme Court to require *Miranda* warnings in the first place. The detective's tactics were startlingly similar to the "Mutt and Jeff act" described in *Miranda,* save for the fact that "Mutt"—here, "the lions"—remained off-stage. Moreover, these statements "obvious[ly]" had the "manifest purpose" of subverting *Miranda* and inducing S.W. *not* to remain silent and *not* to ask for a lawyer.[11] *See Seibert*, 542 U.S. at 613. After all, if the detective had truly wanted

---

[10] As discussed below, I agree with the determination in Part II.B.2 of the court's opinion that these coercive statements rendered S.W.'s eventual waiver of his rights involuntary. But the detective's coercive statements also—first— undermined the effectiveness of the warning itself.

[11] While Justice Kennedy agreed with the *Seibert* plurality that *Miranda* warnings may not be delivered in a manner that vitiates their effectiveness, he was of the view that whether the police violated *Miranda* additionally turned on whether the interrogating officer deliberately subverted the warnings. 542 U.S. at 622 (Kennedy, J., concurring). There can be no doubt that deliberate subversion is evident on the facts presented here. *See Hill v. United States*, 858 A.2d 435, 444 (D.C. 2004) (inferring from the circumstances the "designed nature" of police officer's tactics violating Miranda).

to help S.W., the detective could have done so without exhorting S.W. to waive his rights (or without *Mirandizing* him at all), because *Miranda* would not have imposed any limit on the government's use of S.W.'s statements for *that* purpose.[12]

Nevertheless, my colleagues in the majority as to Part II.A conclude that the warnings in this case "adhered to the dictates of *Miranda*" and were "effectively delivered." To do so, they rely almost exclusively on *Hairston v. United States*, 905 A.2d 765 (D.C. 2006), a case applying *Seibert* to a very different set of facts (so different that the government apparently did not deem *Hairston* relevant and did not cite it to us). Glossing over those differences, my colleagues seem to read *Hairston* as announcing a *per se* rule that, as long as a defendant does not speak before the police read from the rights card, the recitation of the information on the card constitutes an effective warning, no matter what else the police say in

---

[12] *Miranda* only limits the use of an interviewee's statements "*against* the individual in court." *Miranda*, 384 U.S. at 469 (emphasis added).

conjunction with that recitation.[13]  But *Hairston*, which clearly employed a fact-specific analysis, does not announce such a rule.[14]

The question in *Hairston* was whether the detective had reduced the effectiveness of the *Miranda* warnings by withholding them until after he had outlined some of the evidence that the police had already developed against the defendant.  905 A.2d at 769-70.  When speaking to the defendant in *Hairston*, the detective stuck to the facts.  Unlike in this case, the detective made no affirmative representations to the defendant about the detective's ability to protect the

---

[13]  My colleagues minimize the detective's statements in this case by characterizing them as "embellishments."  But the statements the detective made before reading the rights card did not "embellish" S.W.'s rights, i.e., make them more attractive; instead, the detective made these rights seem unhelpful, even hurtful to S.W.

[14]  My colleagues warn that there is no "*per se* rule that invalidates any *Miranda* warning as a matter of law if that warning is accompanied by statements inconsistent with *Miranda*."  Opinion of Blackburne-Rigsby, J., at 11 n.7.  But if anyone is in danger of announcing a *per se* rule, it is they.  The majority embraces a "perspective of appellant" (i.e., the interviewee) test to assess the effectiveness of the warnings. *Id*. at 15-16.  But the effectiveness of *Miranda* warnings is supposed to be assessed objectively. *See Seibert*, 542 U.S. at 611-13.  Meanwhile, "asking whether, based on the totality of the circumstances, the pre-*Miranda* remarks and the subsequent *Miranda* warning permitted appellant to knowingly, intelligently, and voluntarily waive his *Miranda* rights," Opinion of Blackburne-Rigsby, J., at 15, is nothing more than an inquiry into the validity of the waiver.  Thus, aside from taking notice of the fact that Detective Howland read S.W. the rights card, the majority's "effectiveness" analysis collapses into a voluntariness test—thereby creating a rule that deems warnings *per se* effective so long as the rights card is read.

defendant from hostile forces, much less did he exhort the defendant to waive his rights so that the detective could "help" him. And unlike in this case, nothing the detective said obscured the nature of the rights he recited to the defendant. Before reading the defendant the rights card, the detective in *Hairston* simply asked the defendant whether "he want[ed] any help in this case, and . . . want[ed] to tell [the detective] his side of the story." *Id*. at 772. Based on the particular facts of the case, this court held that the *Miranda* warnings were effective. *Id*. at 782. But we indicated that, "[d]epending on context," similar behavior by the police might violate a defendant's rights, and that we would not approve of tactics that "resemble[d] the kind of mental games that largely generated the *Miranda* decision itself." *Id*. (quoting *United States v. Brown*, 737 A.2d 1016, 1021 (D.C. 1999)). As explained above, the tactics used in S.W.'s case do fall into that category; thus *Hairston* does not support my colleagues' determination that the *Miranda* warnings delivered to S.W. were effective.

The court ultimately reaches the right result in this case—reversal—based on the determination that S.W.'s waiver of his rights was involuntary. *See* Part II.B.2; Part III. But it does so by holding that S.W. was subjectively coerced by the very statements it determines did not objectively compromise the effectiveness of the recitation of S.W.'s rights. My colleague in dissent on the issue of

voluntariness rightly points out that the majority opinion is in tension with itself. He asserts that this tension supports a conclusion that S.W.'s waiver was voluntary. For the following reasons, I disagree.

It is "our judicial duty," even as we view the facts in the light most favorable to the government, to "indulge every reasonable presumption" against S.W.'s waiver of his rights.[15] *Dorsey v. United States*, 60 A.3d 1171, 1204 (D.C. 2013) (quoting *Zerbst*, 304 U.S. at 464). To determine if S.W.'s will was overborne, the

---

[15] My dissenting colleague on this issue expresses concern that we are giving insufficient deference to the trial court's findings of fact. *See* dissenting opinion of Epstein, J., at Part III.A. Preliminarily, it is important to distinguish factual findings that relate to the voluntariness of S.W.'s *statements* (e.g., which interview questions he answered). The concern of the majority opinion is the voluntariness of the *waiver*. On this subject, the trial court actually made very few factual findings, because the basic facts with respect to how the warnings were delivered and how S.W. waived were not controverted. They were captured on a video recording which was admitted into evidence at trial. That recording is now part of the record on appeal and nothing bars us from considering it. *See Hood v. United States*, 28 A.3d 553, 564 (D.C. 2011) ("We defer to the trial court's reasonable determination of *disputed* facts." (emphasis added)); *see also, e.g.*, *Turner v. United States*, No. 12-CO-1362, 2015 WL 3649305, at *30 (D.C. June 11, 2015) (examining whether there was evidence of "coercion or lack of voluntariness on the videotape" of appellant's interrogation by police).

In the absence of any factual disputes, whether S.W.'s waiver was constitutionally valid is a pure question of law. We owe no deference to the trial court in conducting our analysis; rather, we review this constitutional claim *de novo*. *Castellon v. United States*, 864 A.2d 141, 158 (D.C. 2004) ("This court applies a *de novo* standard of review to the legal determination regarding voluntariness . . . ." (quoting *United States v. Turner*, 761 A.2d 845, 853 (D.C. 2000))); *In re M.A.C.*, 761 A.2d 32, 38 (D.C. 2000).

majority opinion rightly looks to what the detective said to S.W. just before he waived his rights. The majority opinion also rightly looks to S.W.'s ability to understand and appreciate his circumstances. S.W. was just fifteen years old and, as such, was generally more susceptible to influence and coercion.[16] Moreover, as the government attorney in this case acknowledged, S.W. had been diagnosed with ADHD and depression and was receiving special education and related services;

---

[16] In light of studies further documenting juveniles' vulnerabilities in interrogation situations, the American Psychological Association has called for reforms in interrogation procedures, *see* AMERICAN PSYCHOLOGICAL ASSOCIATION, COUNCIL OF REPRESENTATIVES, RESOLUTION ON INTERROGATIONS OF CRIMINAL SUSPECTS (August 2014), *available at* http://www.apa.org/about/policy/ interrogations.aspx, and the International Association of Chiefs of Police has developed a new training program in conjunction with the United States Office of Juvenile Justice and Delinquency Prevention that "instructs officers to explain *Miranda* warnings in language teenagers will understand and not to make false promises of leniency, because of youth's proclivity toward gullibility," Jan Hoffman, *In Interrogations, Teenagers Are Too Young to Know Better*, N.Y. TIMES: WELL (October 13, 2014), http://well.blogs.nytimes.com/2014/10/13/in-interrogations-teenagers-are-too-young-to-know-better/. *See also* Barry C. Feld, *Juveniles' Competence to Exercise Miranda Rights: An Empirical Study of Policy and Practice*, 91 MINN. L. REV. 26, 57-58 (2006) ("Juveniles' lesser understanding of rights and appreciation of legal consequences enhances their vulnerability to interrogation tactics . . . . Youths' waiver decisions reflect a greater tendency than adults to comply with authority figures and to acquiesce to police officials. Interrogation techniques designed for adults may prove especially problematic when deployed against young suspects."); *id.* at 48 ("To summarize, developmental psychological research assessing several domains of legal and adjudicative competence consistently indicates that adolescents as a class are at a significant disadvantage in the interrogation room . . . compared with adults. For youths fifteen years of age and younger, these disabilities emerge clearly in the research.").

his circumstances prompted the court to observe at sentencing that S.W. "need[ed] a lot of work, a lot of help," both in terms of treatment and medication.[17]

Beyond these facts, I cannot ignore the timing of S.W.'s interrogation, a factor that has received little attention. According to the detective who interrogated S.W., the police arrested S.W. just after the incident at 10:20 a.m., and conducted a show-up identification soon after. But, as the video recording of the interview reflects, the detective read S.W. his rights at 11:54 p.m. Thus S.W. was in custody for over twelve hours before being interrogated,[18] and his exhaustion is evident in the video: when he enters the room, he immediately puts his head on his knees, as if to go to sleep.

The unexplained twelve-hour wait between arrest and interview, S.W.'s age and particular cognitive issues, and the confusing, misleading, and coercive

---

[17] Although the trial court found that S.W. did not have immediate mental health concerns and "seemed lucid," his competence was not the question. Rather, the question was the validity of his waiver. As to that legal question, as explained above, *see supra* note 15, we do not defer to the trial court and we undoubtedly may consider S.W.'s youth, cognitive issues, and general mental health.

[18] The record is silent as to what the police did with S.W. for those twelve hours, but this evidentiary deficit counts against the government, as it is the government's burden to prove that S.W.'s waiver was voluntary. *Dorsey*, 60 A.3d at 1177; *Di Giovanni v. United States*, 810 A.2d 887, 892 (D.C. 2002) (citing *In re M.A.C.*, 761 A.2d at 36).

*Miranda* warnings S.W. received before he waived his rights amply support the majority opinion's conclusion that S.W.'s waiver was not voluntary.[19] Thus, I have no reservations about the court's conclusion that S.W.'s waiver of his *Miranda* rights was invalid.

Nevertheless, I think it is ill-advised for the court to resolve this case on voluntariness grounds for two reasons. First, by upholding the warnings delivered in this case as effective, this court reduces *Miranda* warnings to a technicality, an incantation with no force or real meaning—a result, I submit, that cannot be squared with the Supreme Court's decision in *Miranda* or its progeny. Second and relatedly, the subjective totality-of-the-circumstances analysis on which the majority opinion relies is an imperfect safeguard for the rights the Supreme Court in *Miranda* sought to protect with clearcut warnings. In other words, although this opinion gives well-deserved relief to S.W., it dismantles the critical protection that *Miranda* is supposed to extend to all individuals who are in custody and subjected to interrogation. Accordingly, although I concur in the determination that S.W.'s waiver was involuntary and in the judgment of reversal, I dissent from the decision not to resolve this case on the ground that the detective's *Miranda* warnings were

---

[19] I would not reach the question whether S.W.'s waiver was knowing or intelligent, but I think it is far from clear that it was.

ineffective. These warnings were both confusing and coercive, and they virtually guaranteed that S.W. would waive the very rights they were meant to protect.


EPSTEIN, *Associate Judge, concurring in part and dissenting in part*: I concur in the conclusions that (1) Detective Howland's prefatory comment did not make the subsequent *Miranda* warnings ineffective and (2) S.W. knowingly and intelligently waived his Fifth Amendment rights. I am, however, constrained to dissent from the holding that S.W.'s self-incriminating statements were involuntary. In my view, the majority opinion reaches the incorrect conclusion for three main reasons. First, the majority opinion incorrectly applies the standard of review by failing to give the trial court's reasonable inferences and weighing of the evidence the deference to which they are entitled. Second, the majority opinion conflates the well-established distinction between a permissible statement that a suspect can help himself by cooperating and an impermissible statement that a suspect will be penalized if he chooses not to talk. Third, the majority opinion does not follow our precedent when it gives overriding importance to the detective's initial statement to S.W. instead of treating it, as the trial court did, as only one factor in the totality of the circumstances.

As the majority recognizes, "'cases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *Dickerson v. United States*, 530 U.S. 428, 444 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)). The majority concludes that this is one of those rare cases. This case, however, is even more rare than the cases contemplated by the Supreme Court: the majority concludes not just that S.W. made a "colorable" argument that his statement was compelled, but that his argument is so strong that we should reject the trial court's finding that his statement was voluntary. The evidence that Detective Howland overbore S.W.'s free will is not so one-sided or overwhelming that we can or should substitute our judgment for the trial court's.

*Dorsey v. United States*, 60 A.3d 1171, 1203 (D.C. 2013) (en banc), establishes that we must defer to the trial court's choice between two permissible views of the overall evidence concerning the voluntariness of a confession. In *Dorsey,* we "consider[ed] the question of voluntariness on the present record to be exceedingly close," *id.*, but because of the deferential standard of review, we affirmed the trial court's finding that the defendant confessed voluntarily. Similarly in *Beasley v. United States*, 512 A.2d 1007, 1016 (D.C. 1986), "we d[id]

not condone certain of the tactics used by the police in this case, and such tactics have made this a close case. Yet, we [we]re satisfied that the totality of the circumstances supports the trial court's finding of voluntariness." Here, the question is not nearly as close as it was in *Dorsey* and no closer than it was in *Beasley*, so affirmance is again the right result.

## I.    The standard of review

In *Dorsey*, the court *en banc* reaffirmed that "[i]n reviewing the denial of a motion to suppress statements on constitutional grounds, we must defer to the trial court's findings of historical fact as long as they are not clearly erroneous." *See* 60 A.3d at 1190 (footnote and citations omitted). "The 'clearly erroneous' standard of review is highly constraining; it 'plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is … convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id.* at 1205 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)). Where "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *See* 60 A.3d at 1205-06 (quotation and citation omitted).

This deference includes the trial court's weighing of the evidence: "as a reviewing court, we may not usurp the prerogative of the [trial] judge, as the trier of fact, to determine credibility *and weigh the evidence*." *See Dorsey*, 60 A.3d at 1205 (emphasis added, quotation and footnote omitted). In addition, "we must view … the reasonable inferences that may be drawn from [the facts] in the light most favorable to sustaining the court's ruling." *See id*. at 1190 (footnote and citation omitted). Because we defer to the trial court's weighing of the evidence and reasonable inferences, deference to a voluntariness finding is required even when a suspect's confession was videotaped, although we of course consider whether the videotape actually supports the trial court's findings. *See id*. at 1205.

"However, our review of the trial court's legal conclusions is *de novo*." *Dorsey*, 60 A.3d at 1190 (footnote and citation omitted); *see, e.g., In re M.A.*, 33 A.3d 378, 381 (D.C. 2011). This distinction between factual findings and legal conclusions reflects that "the trial court's determination of voluntariness is itself a mixed question of fact and law …." *Frost v. United States*, 618 A.2d 653, 657 (D.C. 1992) (quotations and citations omitted).

That said, "an issue does not lose its factual character merely because its resolution is dispositive of the ultimate" legal question. *Miller v. Fenton*, 474 U.S.

104, 113 (1985) (discussing appellate review of the voluntariness of confessions). "The answer to the legal question about the voluntariness of the confession may turn upon the answer to a subsidiary factual question, say 'whether in fact the police engaged in the intimidation tactics alleged by the defendant.'" *See Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 842 (2015) (quoting *Miller*, 474 U.S. at 112).[1] "An appellate court will review the trial judge's factual determination about the alleged intimidation deferentially (though, after reviewing the factual findings, it will review a judge's ultimate determination of voluntariness *de novo*)." *Teva Pharmaceuticals*, 135 S. Ct. at 842. As we recently held in a case involving an analogous issue, we review *de novo* on appeal the ultimate question of whether evidence withheld in violation of *Brady* is material, but we give "due appreciation for the fact-bound nature of that ultimate question" and therefore "defer in this case to the motions judge's assessments of credibility, evaluations of the weight of the evidence and the inferences to be drawn therefrom, and findings of historical fact, so long as they have record support." *Turner v. United States*, 116 A.3d 894, 915 (D.C. 2015).

---

[1] *Teva Pharmaceuticals* decided the standard of review of a trial court's construction of patents, but it relied on *Miller*, a case involving the analogous issue of appellate review of trial court decisions about the voluntariness of confessions.

Independent appellate review of ultimate determinations of voluntariness serves three purposes: (1) "a unitary system of law" requires consistent results in cases with no significant difference in the facts; (2) independent review is "necessary if appellate courts are to maintain control of, and to clarify, the legal principles" because the legal rules "acquire content only through application," and (3) "*de novo* review tends to unify precedent and will come closer to providing law enforcement officers with a defined set of rules which, in most instances, makes it possible to reach a correct determination beforehand" about whether their conduct is constitutional. *See Ornelas v. United States*, 517 U.S. 690, 697 (1996) (quotation omitted). *Ornelas* involved appellate review of determinations of probable cause and reasonable suspicion, but the reasons for *de novo* review of the ultimate question apply equally to voluntariness of a confession.[2]

Independent appellate review of the ultimate legal question empowers appellate courts to reject trial courts' findings of voluntariness when confessions are "procured by means 'revolting to the sense of justice.'" *Miller*, 474 U.S. at 109 (quoting *Brown v. Mississippi*, 297 U.S. 278, 286 (1936)). *De novo* review

---

[2] Although *Ornelas* held that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal," the Supreme Court "hasten[ed] to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id*. at 699.

requires reversal when "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *See Miller*, 474 U.S. at 109. An appellate court's duty to make an independent evaluation of the record "is not limited to instances in which the claim is that the police conduct was inherently coercive," and it "applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." *Id*. at 110; *see, e.g., Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) ("Although the question is a close one, we agree with the Arizona Supreme Court's conclusion that Fulminante's confession was coerced" because he was told that his life would be in danger if he did not confess).

Thus, the "fact-bound" aspect of the ultimate legal question, *see Turner*, 116 A.3d at 915, is whether a particular suspect's "will was in fact overborne," and the ultimate legal question is "whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means." *See Miller*, 474 U.S. at 116. As an appellate court considering the ultimate legal question, we

ask whether, "even if [the particular suspect] were unusually resistant to psychological coercion, 'the technique used here risks overcoming the will of the run-of-the-mill suspect.'" *United States v. Harrison*, 34 F.3d 886, 892 (9th Cir. 1994) (quoting *Collazo v. Estelle*, 940 F.2d 411, 426 (9th Cir. 1991) (Kozinski, J., concurring)).

## II.    Benefits of cooperation vs. penalties for non-cooperation

Before I turn to the facts of this case, it is useful to discuss a critical distinction between (1) telling a suspect that he can help himself by cooperating and (2) telling a suspect he will be penalized if he chooses not to cooperate. The first type of statement by the police does not necessarily invalidate a confession, although it may combine with other factors to support a finding that a confession was involuntary. On the other hand, the second type of statement is highly likely to preclude a finding that a confession is voluntary.

This court and other courts have consistently held that telling a suspect that he can help himself by waiving his Fifth Amendment rights is only one factor that courts should consider in deciding whether a defendant's statement to the police was voluntary. *Beasley* confirms that promises of leniency do not necessarily

invalidate a confession: "any alleged promises by the police of leniency in exchange for a confession must be viewed by the trial court under the totality of all the surrounding circumstances to determine whether they were sufficient to overbear [the suspect's] free will." 512 A.2d at 1016 (quotation and citation omitted). Similarly, in *United States v. Thomas*, 595 A.2d 980, 983 (D.C. 1991), we concluded that an interview including threats and promises involving cooperation was "plainly not without its inducive elements" but did not involve "police oppression or overreaching approaching the type" requiring suppression of confessions as involuntary. *M.A.*, 33 A.3d at 381-82, concluded that statements by the detective to the suspect that "the best thing you can do is tell the truth" did not directly contradict the *Miranda* warnings or invalidate his voluntary waiver. Citing *M.A.* and other cases, the majority opinion agrees that "not all forms of pressure to waive *Miranda* rights to avoid adverse consequences are coercive and in violation of *Miranda*."

Likewise, the Supreme Court upheld a trial court's finding that police officers' statements that a cooperative attitude would benefit the suspect did not coerce the confession, even though the suspect was only 16 years old. *Fare v. Michael C.*, 442 U.S. 707, 727 (1979). Multiple federal courts of appeal have concluded that a police officer's statement that a suspect can help himself by

speaking does not render the suspect's subsequent statement involuntary. *E.g.*, *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); *Miller v. Fenton*, 796 F.2d 598, 607, 608-10 (3rd Cir. 1986) (a confession was voluntary even though the interrogator assured the suspect that he just wanted to help and did not believe the suspect was a criminal who should be punished); *United States v. Umaña*, 750 F.3d 320, 344 (4th Cir. 2014) ("We have consistently declined to hold categorically that a suspect's statements are involuntary simply because police deceptively highlight the positive aspects of confession," including telling "the suspect that by talking to them he would do nothing but help himself" or "things would go easier on the suspect if he confessed") (quotations and citations omitted); *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1348 (5th Cir. 1994) (upholding finding that defendant voluntarily confessed after being told there were advantages to cooperation); *United States v. Otters*, 197 F.3d 316, 318 (8th Cir. 1999) ("The promise of leniency − not to file charges associated with the traffic stop − was not enough by itself to make Otters's statements involuntary."); *United States v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002) ("Inducements to cooperate are not improper and do not render a suspect's statement involuntary unless under the total circumstances it is plain that they have overborne the free will of the suspect.").

On the other hand, the police may not tell a suspect that exercising his right to remain silent will make him worse off than he would otherwise be. Albeit in dictum, *Dorsey* approvingly quoted *Harrison* for the proposition that "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." *Dorsey*, 60 A.3d at 1204 & n.109 (quoting *Harrison*, 34 F.3d at 891-92). At the same time, *Harrison* recognized that "the police generally may offer to tell the prosecutor about the defendant's cooperation and suggest that cooperation may increase the likelihood of a more lenient sentence." 34 F.3d at 891 (citations omitted). *Harrison* went on, "In many ways, both types of statements are simply different sides of the same coin: 'waive your rights and receive more favorable treatment' versus 'exercise your rights and receive less favorable treatment.'" *Id*. However, *Harrison* drew a substantive distinction between the two types of statements because "[r]efusal to cooperate is every defendant's right under the fifth amendment" and "[u]nder our adversary system of criminal justice, a defendant may not be made to suffer for his silence." *Id*.[3]

---

[3] We have recognized the same issue in the sentencing context, where a sentencing judge may impose a lighter sentence if a defendant decides to plead guilty and accept responsibility, but may not impose a heavier sentence on a defendant because the defendant decides to exercise his constitutional right to a jury trial. "The line between affording leniency to a defendant who has admitted guilt by pleading guilty and punishing one who has denied his guilt and proceeded

"The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw." *Dickerson*, 530 U.S. at 444 (quotation and citation omitted). Nevertheless, we draw the line between (1) statements about the benefits to a suspect of cooperation and (2) statements threatening harsher treatment of suspects who exercise their constitutional rights. If the interrogator's statement is on the wrong side of the line, our obligation to conduct a *de novo* assessment of the ultimate legal question of voluntariness generally requires us to suppress a confession even if the trial court found that the suspect nevertheless confessed voluntarily. "We can't allow police to advise suspects that they will pay dearly for taking advantage of their right to counsel precisely because some suspects will succumb to the pressure, even if this suspect did not." *Collazo*, 940 F.2d at 427 (Kozinski, J., concurring).

In drawing this line in any specific case, we must keep in mind the fact that "[c]ustodial interrogations implicate two competing concerns." *See Moran v. Burbine*, 475 U.S. 412, 426 (1986). On the one hand, police interrogation is a necessary "tool for effective enforcement of criminal laws," and "[a]dmissions of guilt are … essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Id.*; *see Davis v. United States*, 512 U.S.

to trial is elusive, to say the least." *Coles v. United States*, 682 A.2d 167, 169 (D.C. 1996).

452, 461 (1994) (one "side of the *Miranda* equation" is "the need for effective law enforcement"). "On the other hand, the Court has recognized that the interrogation process is inherently coercive and that, as a consequence, there exists a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion." *Moran*, 475 U.S. at 426 (quotation and citation omitted). Thus, in deciding whether the interrogator crossed the line in a particular case, we must strike a balance between society's compelling interest in uncoerced admissions of guilt and protecting suspects from coercion.

## III. Applying the standard of review to the facts

If we apply the correct standard of review to S.W.'s confession, the result is straightforward: the trial court's finding that S.W.'s will was not overborne is based on a permissible view of the evidence, so we must defer to it.

The key factor in the majority's conclusion that S.W.'s confession was not voluntary is Detective Howland's brief prefatory statement before he gave the *Miranda* warning and before S.W. knowingly and voluntarily waived his constitutional rights. For the reasons I explain in Section A, characterizing the

detective's statement as threatening a penalty for silence is inconsistent with the record and fails to give the required deference to the trial court's inferences. For the reasons I explain in Section B, the majority opinion errs by giving overriding weight to the detective's statement instead of treating that statement, as the trial court did, as one factor to be weighed in assessing whether S.W.'s will was overborne. Finally, Section C explains why the reasons for independent appellate review of ultimate determinations of voluntariness do not support disregarding the trial court's weighing of the relevant factors.

## A. *Detective Howland's statement*

The majority opinion treats Detective Howland's pre-*Miranda* statement to S.W. as an attempt to impose a "penalty" on S.W. for invoking his constitutional rights. For the reasons explained in Part II, I agree that if Detective Howland had made such a threat, he would have engaged in prohibited coercion. However, I do not agree that Detective Howland crossed this line. His statement at most approached the kind of general statement about benefits of cooperation that we and other courts have routinely found not to be inherently coercive and to be consistent with a voluntary waiver.

As a threshold matter, we must defer to the trial court's assessment of Detective Howland's ambiguous statements. The majority opinion agrees that the trial court fairly characterized Detective Howland's introductory remarks as general statements that simply provided context for the boilerplate *Miranda* warnings that followed. The majority opinion acknowledges that "Detective Howland did not explicitly tell appellant that 'it might be worse' for him if he invoked his rights, as in *Collazo*." The majority opinion adds that Detective Howland "strongly implied it," but we should defer to the trial court's reasonable inferences from the detective's words. "An appellate court will review the trial judge's factual determination about the alleged intimidation deferentially …." *See Teva Pharmaceuticals*, 135 S. Ct. at 842 (citing *Miller*, 474 U.S. at 112); *Loza v. Mitchell*, 766 F.3d 466, 479 (6th Cir. 2014) (concluding, after reviewing the video recording and transcript of the defendant's interrogation, that it was "not unreasonable" for the state court to determine that the detectives did not threaten to harm the defendant's girlfriend and unborn child unless he confessed).

Although he set himself apart from the lions who thought S.W. "did a whole bunch of stuff," Detective Howland did not suggest to S.W. that he would give S.W. a pass if he made incriminating statements. To the contrary, Detective Howland explicitly told S.W. that he thought S.W. committed the carjacking: "I

think what happened today was just a one-time thing." Moreover, his statement to S.W. about the lions was immediately followed by the *Miranda* warning that any statement by S.W. can be used against him in court. *See Jaswal*, 47 F.3d at 542 ("There is no inconsistency between the required warning that the defendant's statement may be used against him and a further statement that cooperation can help him" because "[b]oth are true"). The trial court reasonably found that S.W. understood that he was facing a significant set of charges.

To the extent that Detective Howland implied that cooperation might help S.W., his statement was not inherently coercive. *See* Part II above. In *Fare*, "[t]he police did indeed indicate that a cooperative attitude would be to respondent's benefit," but the Supreme Court nevertheless upheld a finding that the confession was voluntary because the officers' "remarks in this regard were far from threatening or coercive" – even to a 16-year-old juvenile. 442 U.S. at 727. At most, Detective Howland implicitly suggested what the interrogator in *Fare* explicitly told the juvenile in that case − that a cooperative attitude would benefit S.W.

As the videotape shows, Detective Howland's manner makes his words even farther from threatening or coercive than they may seem in a written transcript.

S.W. himself correctly characterizes Detective Howland's tone as "avuncular." Detective Howland was matter-of-fact and low key − not aggressive, threatening, or overbearing. *Cf. Collazo*, 940 F.2d at 416 (one factor contributing to coerciveness was that the interrogator's tone and presentation were "insistent"). Detective Howland was also rather distracted: the transcript in the majority opinion omits that when Detective Howland first started to say "I stand between you …," his phone rang, and he looked at his phone and started over; then he again did something with his phone and had to re-focus his attention. As the trial court stated, and the videotape confirms, Detective Howland kept his physical distance from S.W. – not getting in S.W.'s face or space.

The majority opinion characterizes Detective Howland's statement "as a veiled threat" to penalize S.W. if he invokes his constitutional rights. It was up to the trial court to determine what, if anything, was behind any veil, but the record indicates that Detective Howland's statement was not a threat, veiled or otherwise. It would be coercive if Detective Howland had told S.W., as the detectives told the suspect in *Dorsey*, that law enforcement officials "are going to up the charges unless you tell the truth." *See* 60 A.3d at 1186. But Detective Howland said nothing like that. He stated that the lions had already concluded that S.W. "did a whole bunch of stuff," and he did not tell S.W. – directly or indirectly − that the

lions would try to pin other crimes on S.W. only if he remained silent. I therefore do not agree with the majority opinion that Detective Howland told S.W. that the lions would attempt to hold him responsible for crimes in addition to the carjacking "unless appellant accepted the opportunity 'to give [his] version of what happened.'" At most, the detective said that things were already bad for S.W. and might get better if he talked – not that things were not nearly as bad as they would become if he chose not to talk.

The majority opinion also states, "Taken together, these statements seem to suggest that if appellant remained silent, he would face fabricated charges for things that he did not do." There is absolutely no support in the record for any speculation that (1) the lions would fabricate charges if S.W. remained silent, or (2) the lions had already fabricated charges and did not genuinely believe S.W. was guilty of any crime other than the carjacking. Notably, S.W. does *not* argue that the "lions" fabricated other charges or that they would do so if and only if he remained silent, and he attributes to them only an "erroneous belief" that S.W. was responsible for other crimes. When Detective Howland testified at the hearing on the suppression motion, the defense did not elicit, and the government had no reason to elicit, testimony from him about the good faith of the other officers. In any event, to overturn the trial court's finding that S.W.'s will was not overborne,

we need more than statements that only "seem to suggest" that the police were overreaching.

For these reasons, the majority's spin on Detective Howland's words effectively erases the critical distinction discussed in Part II between telling a suspect that cooperation will benefit him and telling him that he will be penalized if he exercises his rights. If Detective Howland's words constitute a threat to impose a penalty on S.W. for invoking his constitutional rights, then any and all statements that any interrogator makes about the benefits of cooperation would constitute a threat. The majority opinion asserts, "In essence, by portraying himself as protective from the 'lions out there,' Detective Howland supplied the reverse implication: that if appellant does not waive his rights, Detective Howland will throw him to the 'lions.'" But if any statement that cooperation will help necessarily has the "reverse implication" that the interrogator will retaliate against the suspect if he does not cooperate, the distinction between the two types of statements would be eliminated. A defendant who chooses to forego any benefit from cooperation by remaining silent may end up worse off than if he had chosen to talk, but that does not mean he would be penalized for his silence. By drawing the distinction between promises of benefits from cooperation and threats of retaliation for non-cooperation, the courts have struck the appropriate balance

between (a) protecting society's compelling interest in keeping interrogation as an effective tool to elicit confessions from guilty people and (2) protecting innocent people from an interrogation process that is inherently coercive. *See Moran*, 475 U.S. at 426-27. The majority opinion upsets this balance and undermines this compelling societal interest.

Put differently, Detective Howland did not say anything calculated to produce a false confession about the carjacking. It is "necessarily coercive" for the police to engage in "conduct that influences a rational person who is innocent to view a false confession as more beneficial than being honest," so "our task is to examine whether [the suspect] was not able to make a rational decision due to promises made by the interrogating detective." *See United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009). Detective Howland did not say anything that would influence a rational person who is innocent to decide that a false confession to the carjacking would make him better off than remaining silent. As with the juvenile's confession in *In re D.A.S.*, 391 A.2d 255, 259 (D.C. 1978), "the record provides an adequate basis for the trial court's conclusion that the confession was the product of a knowing, intelligent and voluntary waiver of appellant's rights,"

and the interrogation technique "practiced here by the police was not of the sort which would induce a false confession or would overcome the appellant's will."[4]

## B. *The totality of the circumstances and the weighing of the evidence*

"The presence of official compulsion – 'coercive police activity' or 'police overreaching' – is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause." *Turner*, 116 A.3d at 935. "That said, in determining whether a defendant's will was over-borne in a particular case, the Court has assessed the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Id*. (quotation, brackets, and citation omitted). Likewise, "the totality-of-the-circumstances analysis still applies in determining the validity of the waiver and the voluntariness of the statement even though the interrogation involves a juvenile." *In re M.A.C.*, 761 A.2d 32, 36 (D.C. 2000) (citing *Fare*, 442

---

[4] The other dissenting opinion suggests that in making these statements based on holdings in our earlier cases, I am losing sight of the purpose of *Miranda* warnings not only to forestall false confessions but also to protect the privilege against self-incrimination. As *D.A.S.* indicates, relevant to whether an interrogator's statement is coercive is whether the statement is likely to elicit a false confession. Detective Howland's statement does not fall into that category. There is no suggestion that S.W. confessed to a crime he did not commit; the victim identified S.W. in a show-up shortly after the carjacking and again at trial, and S.W. did not contest at trial the victim's account of his actions.

U.S. at 725). "'[A]dmissions and confessions of juveniles require special caution,'" but even with juveniles, "rather than giving overriding importance to any one factor, the court must consider the totality of circumstances surrounding the confession." *See D.A.S.*, 391 A.2d at 258 (quoting *In re Gault*, 387 U.S. 1, 45 (1967)).

Instead of treating Detective Howland's alleged threat as only a "necessary predicate" to a finding of involuntariness, the majority opinion gives it the "overriding importance" that *D.A.S.* holds it should not get. The trial court properly considered all the relevant factors in examining the totality of the circumstances, and its comprehensive analysis reasonably supported its finding that S.W.'s confession was voluntary. As the majority opinion states, the voluntariness "inquiry rests on many of the same factors mentioned in our 'knowing and intelligent' inquiry," and the same factors that the majority opinion agrees demonstrate that S.W. waived his rights using his own rational thought and intellect also demonstrate that he waived them voluntarily.

As I discussed in Section A, Detective Howland made only a general, non-threatening suggestion that S.W. might help himself by cooperating, and his manner was avuncular and matter-of-fact − not aggressive or relentless. After his

prefatory statement, Detective Howland immediately gave effective *Miranda* warnings, and as the majority opinion recognizes, it is a "rare" case "in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* …." *Dickerson*, 530 U.S. at 444 (quotation and citation omitted). The other relevant factors also strongly support, or are consistent with, the trial court's finding of that S.W.'s confession was not coerced.

First, several objective factors involving the structure of the interview support the finding of voluntariness. Detective Howland was the only detective present during the interview, so this is not a case where a group of interrogators bore down on a lone suspect. S.W. confessed immediately after Detective Howland began asking questions, and S.W. was not worn down by hours of relentless questioning. *See In re J.F.*, 987 A.2d 1168, 1177 (D.C. 2010) ("J.F.'s vulnerability was exacerbated by the fact that he was questioned for three hours …."); *Miller*, 796 F.2d at 606 (an interrogation lasting less than an hour "was not 'a process of interrogation … so prolonged and unremitting, especially when accompanied by deprivation of refreshment, rest or relief, as to accomplish extortion of an involuntary confession'") (quoting *Stein v. New York*, 346 U.S. 156, 184 (1953)). Including interruptions from his phone, the detective's comments

about the "lions" took literally 30 seconds, and he spent more time administering the *Miranda* warnings that followed.

Second, S.W.'s behavior and demeanor strongly support the trial court's finding. Even though S.W. was only 15 years old, he maintained a steady and calm demeanor when he waived his *Miranda* rights and answered the detective's questions about what happened that afternoon. Nothing in S.W.'s words or body language indicates that he was intimidated or frightened or confused by Detective Howland's statement about the lions or that it affected his decision to answer the questions about the incident at the gas station. *See Beasley*, 512 A.2d at 1016 ("appellant's own behavior during the interrogation indicates that the officers' statements were not sufficient to coerce a … confession.").[5]

---

[5] The majority opinion states that "there is some confusion as to how long appellant had been in custody" when his brief interview began, and that this factor "appears to weigh in favor of an involuntary waiver." The other dissenting opinion attributes significance to the gap between S.W.'s arrest (which was shortly after the carjacking) and the interview. S.W. did not make this argument, even though he is represented by highly competent counsel. S.W. states in his brief that the interview began at 11:54 "a.m." shortly after he was arrested, and this indicates to me that Detective Howland simply misspoke when he said "p.m." instead of "a.m." when he began the interview. In any event, if we are concerned about an issue that was not briefed here or raised in the trial court, we should ask the parties to brief the issue or remand the case to the trial court for further evidence or at least additional findings. For example, although the other dissenting opinion asserts that S.W.'s "exhaustion is evident in the video," exhaustion is not evident to me.

In these circumstances, the trial court reasonably found that S.W. wanted to talk about the carjacking incident. The trial court did not make a factual finding about the specific reason why S.W. decided to admit his involvement in the carjacking, but many people who understand that their statements can be used against them nevertheless confess without any coercion. *Cf. Dorsey*, 60 A.3d at 1205 (where the trial court found that Mr. Dorsey confessed because he was remorseful); *Miller*, 796 F.2d at 613 ("Many criminals experience an urge during interrogation to own up to their crimes ...."). [6] As the trial court also found, S.W. picked and chose the questions he wanted to answer, and he had no difficulty deciding not to answer certain questions – an approach inconsistent with any supposition that his will was overborne because the interrogator convinced him that his situation was hopeless. I would add that S.W. did not testify or present any direct evidence that he felt intimidated or coerced by anything Detective Howland said or did or that he understood the detective to be telling him that the detective would throw him to the lions unless he talked to him without a lawyer. [7]

---

[6] *Cf. Towles v. United States*, 115 A.3d 1222, 1229 (D.C. 2015) (many people voluntarily consent to searches by the police even though they know that the searches will reveal contraband).

[7] The government could not have used S.W.'s testimony at the suppression hearing against him in its case-in-chief at trial. *See Simmons v. United States*, 390 U.S. 377, 394 (1968).

Third, "no special factors indicated that [S.W.] was unable to understand the nature of his actions." *See Fare*, 442 U.S. at 726 (upholding the voluntariness of a confession of a 16-year-old suspect). "There is no indication that [S.W.] was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be." *See id.* As the majority opinion agrees, the trial court noted the absence of mental health concerns. The trial court did not rely on information that S.W. had been in custody before, because there were no real specifics about his prior contacts with the criminal justice system, including prior *Miranda* warnings. *See Fare*, 442 U.S. at 726 (discussing the significance of prior experience with the police).

On this record, the trial court reasonably concluded that S.W. confessed because he made a voluntary decision to waive the rights that he understood he had, and the "special caution" with which we must consider confessions by juveniles (*see In re D.A.S.*, 391 A.2d at 258) does not compel the conclusion that S.W.'s confession was coerced. In the circumstances of this case, the trial court's finding concerning the subsidiary factual question (was S.W.'s will overborne?) is dispositive of the ultimate legal question of voluntariness, which itself has a fact-bound nature. *See Teva Pharmaceuticals*, 135 S. Ct. at 841-42; *Turner*, 116 A.3d at 915. The deferential nature of the review in these circumstances helps to explain

why we have affirmed in close cases where the trial court found a confession to be voluntary. *See, e.g.*, *Dorsey*, 60 A.3d at 1203; *Beasley*, 512 A.2d at 1016.

I do not suggest that the majority's view of the evidence is unreasonable. If the trial court had drawn the same inferences from the historical facts that the majority opinion draws and weighed the factors relevant to voluntariness in the same way the majority opinion does, and if the government had then appealed a finding that S.W.'s confession was not voluntary, I would affirm the ruling under the deferential standard of review. However, *Dorsey* is only one in a long line of cases that precludes us from usurping the trial court's role, and it requires us to affirm if the trial court's weighing of the evidence is permissible, even if we would weigh the evidence differently if we were the factfinders. I consider the trial court's weighing of the evidence as a whole to be eminently reasonable: S.W.'s age and Detective Howland's preface may have created a risk that S.W. would feel pressured to waive his rights; but the risk did not in fact materialize because the detective's comment preceding the *Miranda* warnings was not threatening or coercive, his tone was avuncular, S.W. was composed and relatively mature for his age, and S.W. unhesitatingly decided to confess in a brief interview in which he chose not to answer numerous other questions.

### *C. A middle-of-the-road ruling*

For the reasons explained in the preceding sections, the trial court's finding on this record that S.W.'s statement was voluntary is fully consistent with precedent and "with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means." *See Miller*, 474 U.S. at 116. As I discussed in Part I, it is only when interrogation tactics are "revolting to the sense of justice" or "offensive to a civilized system of justice" that appellate courts must reject the trial court's finding of voluntariness. *See id*. at 109 (quotation and citation omitted). Detective Howland's approach did not come close to violating that standard. The majority opinion does not demonstrate that Detective Howland's statements were different in kind or even degree from the statements by interrogators about the benefits of cooperation that courts have consistently held do not preclude a finding of voluntariness.

Because the trial court's voluntariness finding is in the mainstream, overturning it would not serve, and would in fact undermine, the purposes of independent appellate review of the ultimate legal determination. *See* Section I above. First, reversing the trial court's ruling would produce a result inconsistent with the results in cases with comparable facts. Second, it would leave law

enforcement officers with a more poorly defined and indeed newly conflicting set of rules about how to conduct interrogations. Third, we can "maintain control of … the legal principles" without reversing the trial court here. *See Ornelas*, 517 U.S. at 697.

The majority opinion compares this case to *Collazo*, but the totality of the circumstances there stand in sharp contrast to the totality of the circumstances concerning S.W. In *Collazo*, the police conduct was egregious by any standard, and the Ninth Circuit emphasized circumstances that are simply not present here. One critical difference is that that Mr. Collazo confessed after he invoked his right to counsel and a police officer then made coercive statements in order to induce Mr. Collazo to change his mind. Instead of respecting Mr. Collazo's request to talk to a lawyer, one of two officers (Officer Destro) told him, "This is your last chance to talk to us" and "it might be worse for you" if he followed his lawyer's advice not to talk to the police. 940 F.2d at 414. The Ninth Circuit concluded that Officer Destro's words, "understood plainly, were coercive," and his "warning that it 'might be worse' for Collazo if he did not cooperate with the police can only be seen as menacing" and as attempting "to impose a penalty on" Collazo's invocation of his constitutional rights. *Id*. at 414, 417. That conclusion was supported by the prosecutor's own characterization of "Officer Destro's tone and

presentation as 'insistent.'" 940 F.2d at 416. The Ninth Circuit also pointed to credible testimony from the defendant: "Collazo testified he was scared, and that Officer Destro's threats are what caused him to change his mind and talk without counsel." *Id.* at 421. The Ninth Circuit stressed (as we did in *Dorsey*, 60 A.3d at 1200-01) that "[a]t a point where the law required him to back off, [the interrogator] did not scrupulously honor Collazo's right to cut off questioning; he stepped on it." *Id.* at 417.

Here, in contrast, S.W. did not ask to speak with a lawyer and instead knowingly and unhesitatingly waived his right to do so after Detective Howland gave *Miranda* warnings. Nor did Detective Howland "demean[] the pre-trial role of counsel … by dispensing a one-sided, unauthorized legal opinion." *Collazo*, 940 F.2d at 418. In addition, S.W. did not testify, as Mr. Collazo did, that he was scared and that the interrogator's statement was the reason he decided to waive his rights and confess.[8]

---

[8] I do not agree with the majority that *Di Giovanni v. United States*, 810 A.2d 887 (D.C. 2002), and *Lee v. State*, 12 A.3d 1238, 1250-51 (Md. 2011), are "*contra*" to the trial court's conclusion. *Di Giovanni* concluded that the defendant's waiver was not knowing and intelligent because he "was initially misinformed and confused as to what [his constitutional rights were." 810 A.2d at 892. The interrogator "went beyond telling appellant that he couldn't have a lawyer during the interview, but basically told him he 'didn't think he would need one'" and that 'it would be best if [he] told [his] side of the story,'" and additional facts supporting our conclusion that Di Giovanni's waiver was not knowing or

On the other hand, this is no more difficult a case than the two cases that we considered close and in which we still upheld the trial court's finding that the confessions were voluntary. *Dorsey* is much closer to the line, and *Beasley* is no further from the line – even taking into account that the suspects in these two cases were adults, not juveniles like S.W.

Look at the facts in *Dorsey*:

- "Dorsey endured a grueling overnight interrogation during which, as the government concedes, detectives violated the rules of *Miranda v. Arizona* and *Edwards v. Arizona* by continuing to press him to confess after he invoked his Fifth Amendment rights − both his right to cut off further questioning and remain silent, and his right to have counsel present during his questioning." *Dorsey*, 60 A.3d at 1176-77

- The detectives expressly told Mr. Dorsey that the prosecutors "are going to up the charges unless you tell the truth." *Id.* at 1186

- In the five-and-one-half hours after the defendant asserted his Fifth Amendment right to counsel, three officers "persisted in trying a variety of

intelligent were "the officers' awareness of Di Giovanni's low intellectual capacity, Di Giovanni's physical condition, [and] his unfamiliarity with the *Miranda* warnings." *Id.* at 894. In *Lee*, the detective's statement that "this is between you and me, bud" violated *Miranda* by "undermining the warning" that the defendant's statements could be used against him. 12 A.3d at 1250-51.

techniques to persuade Dorsey to give in and confess." Among other things, "[t]hey deprived him of needed sleep, ignored his evident physical discomfort and symptoms of alcohol withdrawal, and emphasized his powerlessness until they 'finish[ed] up what [they] ha[d] to do;'" and "[t]hey disparaged Dorsey's desire to talk to a lawyer and to go to court, implying that counsel would give him bad advice and that he could not receive a fair trial." *Id*. at 1197.

- The detectives "took no curative measures at all to counter the impact of the improper badgering Dorsey had endured." *Id*. at 1198.

- "The [detectives'] violations of *Miranda* were flagrant: Ross and Thompson persisted in questioning Dorsey and urging him to change his mind despite his repeated assertions of his constitutional rights; verbally abused him (e.g., by repeatedly calling him a liar); disparaged his request for counsel and a hearing in court as contrary to his best interests; misrepresented to him the benefits of confessing before consulting with counsel (e.g., telling Dorsey that he could plead to 'a straight robbery' so that 'all that other shit don't come in'); threatened that the prosecutors would 'up the charges' if he did not confess; exaggerated the strength of the evidence against him; and fed him what he should say to put himself in a more appealing light." *Id*. at 1200-01.

- "It was as if the detectives had told him explicitly that his *Miranda* rights were inoperative on this occasion." *Id*. at 1202.

It was on these facts that "[w]e consider[ed] the question of voluntariness on the present record to be exceedingly close" and concluded that "such overreaching tactics must be condemned." *Id*. at 1203-04. We deemed it "particularly troubling the detectives' warnings to Dorsey that he would suffer adverse consequences if he insisted on consulting counsel and exercising his constitutional rights, their provision of dubious legal advice to sway Dorsey's judgment, and their suggestions as to what story Dorsey could tell to minimize the gravity of his crimes." *Id*. at 1204. Yet we upheld the voluntariness of the confession that Mr. Dorsey made after he had gotten some sleep and some food and decided that he was remorseful about his actions. *Id*. at 1205-1206.

However critical one may be of Detective Howland's statements to S.W., they did not begin to approach the blatant overreaching in *Dorsey*, and virtually all of the other relevant factors indicate that S.W.'s confession was voluntary. Among other things, Detective Howland did not ignore any invocation of rights, and his comment that he stood between S.W. and the "lions" was immediately followed by explicit and effective *Miranda* warnings.

In *Beasley*, we upheld the trial court's voluntariness finding and rejected Mr. Beasley's argument that the interrogators' promises of leniency and their deceptions about the strength of the government's evidence constituted psychological coercion. After Mr. Beasley waived his rights and denied any knowledge of the alleged crime, the interrogating officers "told appellant that he should 'help himself' and 'tell the truth'" and that "any cooperation would be communicated to the prosecutor," and they "repeated a number of misleading statements to appellant concerning the strength of the evidence against him." 512 A.2d at 1016. The defendant decided to confess only after he met with a detective whom he knew and trusted and who told him to "tell the truth" about the homicide. *Id*. at 1010, 1016. "We th[ought] it is beyond dispute that these remarks were intended to cause appellant to believe that he might as well confess because the weight of the evidence against him was overwhelming," and we could not "say with certainty that such statements had *no* effect whatsoever on appellant's state of mind." *Id*. at 1016. But even though we did not condone the police tactics that made it a "close case," we concluded "that appellant's own behavior during the interrogation indicates that the officers' statements were not sufficient to coerce a false confession." *Id*.

By the same token, even if Detective Howland's suggestion that S.W. should help himself by talking had some effect on S.W.'s state of mind, S.W.'s behavior during the interview, and the other relevant factors, indicate that the suggestion was not sufficient to coerce a false confession. There is no evidence that Detective Howland's statement about the "lions" was inaccurate or misleading. The detectives in *Beasley* made statements to overcome Mr. Beasley's initial refusal to confess, and Detective Howland did not have the history with S.W. that the detective who finally persuaded Mr. Beasley to talk had with Mr. Beasley.

For all of these reasons, I would uphold the trial court's denial of S.W.'s motion to suppress his confession.